HOLLINGSWORTH MAGNIAC AND OTHERS, PLAINTIFFS IN ERROR
v. JOHN R. THOMPSON.

The whole charge of the circuit court was brought up with the record.
By the court. This is a practice which this court have uniformly dis-
countenanced, and which the court trusts a rule made at last term will
effectually suppress.

This court have nothing to do with comments of the judge of the circuit
court upon the evidence. The case of Carver v. Jackson, 4 Peters, 80,
81, cited upon this point.

The question now before the court is, whether the charge to the jury in the
circuit court contains any erroneous statement of the law. In examining
it for the purpose of ascertaining its correctness, the whole scope and
bearing of it must be taken together. It is wholly inadmissible to take
up single and detached passages, and to decide upon them without at-
tending to the context, or without incorporating such qualifications and
explanations as naturally flow from the language of other parts of the
charge. The whole is to be construed as it must have been understood,
both by the court and the jury, at the time it was delivered.

Upon principle and authority, to make an antenuptial settlement void as a
fraud upon creditors, it is necessary that both parties should concur in,
or have cognizance of the intended fraud. If the settler alone intend a
fraud, and the other party have no notice of it, but is innocent of it, she
is not, and cannot be affected by it. Marriage, in contemplation of the
law, is not only a valuable consideration to support such a settlement, but
is a consideration of the highest value, and from motives of the soundest
policy, is upheld with a strong resolution. The husband and wife, par-
ties to such a contract, are therefore deemed, in the highest sense,
purchasers for a valuable consideration; and so that it is bona fide, and
without notice of fraud, brought home to both sides, it becomes unim-
peachable by creditors.

Fraud may be imputed to the parties, either by direct co-operation in the
original design, at the time of its concoction, or by constructive co-opera-
tion from notice of it, and carrying the design upon such notice into
operation.

Among creditors equally meritorious, a debtor may conscientiously prefer
one to another; and it can make no difference that the preferred creditor
is his own wife.

Marriage articles or settlements are not required by the laws of New Jersey
to be recorded, but only conveyances of real estate: and as to convey-
ances of real estate, the omission to record them avoids them only as to
purchasers and creditors, leaving them in full force between the parties.

ERROR to the circuit court of the United States for the eastern district of Pennsylvania.

In the circuit court of Pennsylvania, at October sessions 1826, a feigned issue was made up between the plaintiffs and the defendant, to try the question of the ability of the defendant to pay a debt acknowledged to be due to the plaintiffs, and for which judgments had been obtained in their favour. The competency of the defendant to satisfy the debt, depended on the validity of a certain marriage settlement, made in contemplation of marriage between the defendant and Miss Annis Stockton, daughter of Richard Stockton, Esq., late of New Jersey, to which instrument Mr Stockton was a party, he being, by its provisions, the trustee of his daughter. The marriage settlement was as follows:

"Articles of agreement and covenant made and executed this nineteenth day of December, in the year of our Lord one thousand eight hundred and twenty-five, by and between John R. Thompson, Esq., late of the city of Philadelphia, of the first part, Annis Stockton, daughter of Richard Stockton, Esq., of the second part, and Richard Stockton, of the county of Somerset and state of New Jersey, father and trustee of the said Annis Stockton, of the third part.

"Whereas a marriage is intended to be shortly had and solemnized between the said John R. Thompson and the said Annis Stockton; and whereas the said Richard Stockton has promised to give unto his said daughter a certain lot or tract of land, belonging to him, situate in the county of Middlesex and state of New Jersey, directly opposite the mansion house of the said Richard Stockton, between the old road to Trenton and the turnpike road, which consists of between four and five acres of land, be the same more or less, and is bounded on the north and south by the said roads, on the west by lands of Dr John Vanclave, and the east by a line to be run from the north east corner of the garden now in the possession of Mrs Abigail Field, to the said turnpike road, upon which said lot the said John R. Thompson has begun to build a house. Now, it is hereby agreed between the parties aforesaid, and the said Richard Stockton, for himself and his heirs, doth hereby covenant and agree to and with the parties of the first and second

parts, their .heirs, executors, and administrators, in considera-
tion of the said marriage, and of the love and natural affection
he hath for his said daughter, that from the time of, and im-
mediately after, the said marriage shall be solemnized, he, the
said Richard Stockton, shall and will stand seised of the said .
lot and ƒpremises, and of all and singular the buildings and
improvements which shall be erected and made thereon by the
said party of the first part, to uses, trusts, and purposes herein-
after mentioned, and to none other, that is to say: in trust to
permit the said John R. Thompson, and Annis his wife, during
the time of their joint lives, to possess, live in, and occupy the
said lot, house, and premises, with the appurtenances, free and
clear of all demands; and in case the said parties of the first
and second parts do not think proper to inhabit and reside in
the said premises, that he, the said Richard Stockton, will let
out upon lease the said premises, and receive the rents, issues
and profits thereof, and pay over the same to the said Annis,
party of the second, during the joint lives of the parties of the
first and second parts. And if the said John R. Thompson
should survive the said Annis Stockton and have issue by her,
then in trust to permit the said John R. Thompson, during his
life, to inhabit and occupy the said premises, if he elect so to
do, free and clear as aforesaid, and pay over the said rents and
profits, as he shall receive the same, to the said John R.
Thompson, for the maintenance and support of him and his
family, without he, the said John R. Thompson, being at any
time thereafter accountable to any person or persons for the
said rents and profits. And after the death of the said John
R. Thompson, in trust for the child or children of the said
marriage, in equal shares as tenants in common, in fee simple;
and if there shall be no child or children of the said marriage,
then, upon the death of either of the said parties of the first
and second parts, in trust to convey the said premises to the
survivor in fee simple. And the said John R. Thompson, for
himself, his heirs, executors and administrators, doth covenant
and agree to and with the parties of the second and third parts,
that if the said marriage shall take effect, and in consideration
thereof, he will, with all convenient speed, build and furnish
the said house in a suitable manner, as he shall judge fit and

proper; and that the said erections, improvements and furniture, together with the changes and additions which shall be from time to time made, shall be subject to and included in the said trusts, as far as the same are applicable to each species of property. And further, that he will, in the space of one year from the time the said marriage shall take effect, place out on good security, in stock, or otherwise, the sum of forty thousand dollars, and hand over and assign the evidences thereof to the said party of the third part, who shall hold the same in trust to receive the interest, profits, or dividends thereon, as they shall from time to time arise, to the said party of the second part during the joint lives of the parties of the first and second parts, and that her receipts for the same, and also for what may be produced under the before mentioned trusts, shall be good and valid, notwithstanding her coverture. If the said party of the second part should die before the said party of the first part, and there should be issue of the said marriage, then in trust to receive the said interest, profits and dividends, and pay the same over from time to time to the said party of the first part, during his life, for the support of himself, and the maintenance and education of his children, without his being subject to any account as aforesaid; and after his death, in trust for any child or children of the said marriage in equal shares; and if the said Annis should survive the said John, and there be issue of the said marriage, then to pay over the same to the said Annis, during her life, for her maintenance, and the support and education of the said children, and without her being liable to any account for the same; and after her death, in trust for the child or children of the said marriage in equal shares; and if there shall be no child or children of the said marriage, then upon the death of the said John R. Thompson, or Annis his wife, in trust, to assign and deliver the said securities, and all moneys remaining due, to the one who shall survive, to his or her own uses. And it is further agreed and covenanted by and between the parties aforesaid, that it may be lawful for the said John R. Thompson to act as the agent of the parties aforesaid, in all the matters aforesaid, by the permission and under the control, if need be, of the said trustee, and to change, and from time to time alter the said

securities, as occasion may require, and take new securities in their stead, so as that the fund as aforesaid settled shall always be kept good.　And it is also hereby further agreed and covenanted by and between all the said parties, that the said trustee shall not be held guilty of breach of trust, although he does not act personally in the premises, unless he be expressly desired and requested so to do by one of the other parties hereto, or those claiming under them; and that he shall not in any manner be held liable as trustee, unless for acts of wilful neglect or misconduct."

The plaintiffs and the defendant were merchants residing in Canton, in China, previous to the 25th of March 1825, when the defendant returned to the United States, leaving an agent, Rodney Fisher, in Canton, with full powers to transact his business, and to bind him by commercial contracts, and who was introduced to the plaintiffs as his agent by the defendant. Very large loans were made to the agent of the defendant by the plaintiffs, which were employed in loading the vessels of Edward Thompson; the goods being pledged to pay the loans at Philadelphia, and the shipments so made being for the use of Edward Thompson. Edward Thompson was without credit or friends in Canton, and the credit of his son John R. Thompson was thus employed by his agent to load the ships; the defendant's compensation consisting of the commissions on the transactions.

On the 22d of November 1825, Mr Fisher, as the agent of the defendant, borrowed of the plaintiffs thirty thousand dollars on the pledge of an invoice of goods valued at about forty-two thousand dollars; and on the 2d of December 1825, thirty-three thousand dollars more were borrowed on the pledge of another invoice valued at upwards of forty-four thousand dollars, together exceeding more than sixty-three thousand dollars on pledges of goods exceeding, in invoice amount, eighty-six thousand dollars.

Besides these loans, the defendant obtained others in China, where he also owed some other debts, inconsiderable in amount, and after his return home, he signed his father's respondentia bonds for two hundred thousand dollars.　On all these loans and respondentia, there were large sums lost: the goods pledged

to the plaintiffs did not sell for half the invoice prices; and the defendant lost moreover upwards of twenty thousand dollars by his father's failure. He was not possessed of any real estate, mortgages, public stock or other productive property; and whatever he was worth, if any thing, was involved in his father's affairs.

On the 19th of November 1825, Edward Thompson's insolvency was made public. On the 19th of December 1825, the defendant, having arrived from Canton in this country on the 1st of June of that year, and soon after made an engagement to be married with Annis, the daughter of Richard Stockton, Esq., submitted a statement of his affairs to Mr Stockton, with a view to the marriage settlement before stated, which was executed the same day.

Statement by John R. Thompson, made previous to settlement :

"I have no personal debts except to a small amount, in common course of business and living. I am surety for my father in a respondentia bond to Messrs Schott and Lippincott, in a penal sum of two hundred thousand dollars. If the goods which are pledged sell reasonably well, there can be no loss ; for the freight on these goods, the commissions in China, and the premium on dollars on the outward investment, all tend to enhance the security ; and such is the opinion of Mr Schott expressed to me in a conversation on this subject ; there can, therefore, be no demand on me.

"Upon no fair principle of calculation could the loss, if it should happen, be more than twenty thousand dollars, and I consider myself worth that amount, if not more, in addition to the sum proposed to be settled.

"JOHN R. THOMPSON.

"*December* 19, 1825."

Indorsed by Richard Stockton, "Statement made to the trustee by J. R. Thompson as the basis of the settlement, and upon which it was made.

"R. S."

The marriage took place the 28th December 1825. But during the life of Richard Stockton, the settlement was never acknowledged or registered, nor has the forty thousand dollars

[Magniac and others v. Thompson.]

in productive stock, ever been provided, as the settlement stipulated, by the defendant, who pleads inability to do so, from insolvency. After Mr Stockton's death, and shortly before judgment confessed by the defendant, for the balance remaining due to the plaintiffs, the defendant delivered to Robert Stockton, the eldest son of Richard Stockton, deceased, two promissory notes, together, for nine thousand five hundred dollars, one of which, for four thousand five hundred dollars, is of doubtful worth.

Of the sixty thousand dollars and upwards, due by the defendant to the plaintiffs, a principal sum of about twelve thousand dollars remaining due. Suits were brought for the same against him in Pennsylvania, where he resided, and in New Jersey, where he settled at the time of his marriage, in both of which suits judgments were confessed for the sum claimed.

On the 3d of June 1830, the following agreements relative to the case were entered into by the counsel for the plaintiffs and for the defendant.

Whereas the above named plaintiffs did recover, on the 26th day of November 1827, against the said John R. Thompson, the sum of twenty thousand nine hundred and twenty-nine dollars and seven cents damages, besides costs of suit; and whereas the said plaintiffs allege that the said John R. Thompson has the means of satisfying said judgment and costs, and the said John R. Thompson denies his ability to pay the same, and requires that the proof thereof may be tried by a jury, and an issue for the trial thereof has been agreed upon between the parties, in the circuit court of the United States for the eastern district of Pennsylvania, to April sessions 1830; it is hereby ordered and agreed, that the action as above stated be entered, and that the said John R. Thompson cause an appearance to be entered for him to the same, and that said plaintiffs declare of the said term of a discourse had and moved between the said plaintiffs and the said defendant, of and concerning whether the said defendant has the means, by the property in his marriage settlement or otherwise, of satisfying the judgment aforesaid; and that the said defendant, in consideration of a mutual promise on the part of the said plaintiffs to him made, did promise to pay to the said plaintiffs the sum of twenty-five

[Magniac and others v. Thompson.]

thousand dollars, in case he, the said defendant, has the means or ability of satisfying the judgment aforesaid, so that this said issue may be tried by the country. And it is further ordered and agreed, that the circumstances of the said mutual promises, and of the affirmations and assertions laid in the declaration shall be confessed, so that the said issue may be tried on the merits, and that the costs of the suit shall follow the verdict; but that the said verdict shall give no title to either party to recover from the other the sum laid in the declaration. The merits to be tried without regard to form, and either party to be at liberty, under the direction of the court, to modify or change the pleadings, so as to facilitate such trial on the merits."

"Whereas a feigned issue has been agreed upon between the parties in this case, for the purpose of ascertaining by law whether the defendant, John R. Thompson, has the means, by the property in his marriage settlement, or otherwise, of satisfying the judgment recovered against him in this court to October sessions 1826, No. 18; now, it is hereby agreed to be the understanding of the parties to this suit, that if the plaintiffs recover, that the liability of the security from said defendant shall be to the extent of the property actually settled by said defendant on his then intended wife, by virtue of a marriage settlement, dated the —— day of December 1825.

"And if judgment shall be for the defendant, that the said property contained in said settlement shall be entirely discharged, and the security entered as above stated entirely at an end; either party to be at liberty to carry the case, according to established regulations, to the supreme court of the United States for determination."

The case was tried at the April term of the circuit court in 1831, under these agreements, and a verdict under the charge of the court, was rendered for the defendant. The plaintiffs excepted to this charge and prosecuted this writ of error. The whole of the charge of the court was inserted in the bill of exceptions, and brought up with the record.

The facts of the case as made out in evidence, according to the views of the court, are stated particularly in the charge to the jury.

[Magniac and others v. Thompson.]

The charge was as follows :

" The nominal parties are the plaintiffs and the defendant. The real parties are the plaintiffs and the defendant's wife.

" The nominal question is whether the defendant has any property. The real question is whether the property he owned in December 1825, passed to Richard Stockton, father and trustee of Mrs Thompson, for her use, or whether it remained in the defendant on account of the legal inefficacy of the marriage agreement to divest him of it, and vest it according to that agreement. If it was operative in law, the house furniture and fund in hands of Robert Stockton belong to him in trust for the uses of the agreement.

" If not, then the law deems J. R. Thompson to be the legal owner in trust for his creditors, of whom the plaintiffs seem to be the only ones.

" He remains the owner, not because the agreement is not binding on him, but because, under the circumstances of the case, his indebtedness to the plaintiffs put it out of his power to so divest himse f of it as to prevent his creditors from considering it his so far as to be a fund for the payment of their debt, and this is the only question we have to settle. From the evidence, the plaintiffs' debt is a fair and valid one, as between them and defendant ; between him and Mr Fisher it is not our province to inquire ; that depends, perhaps, on the evidence of authority which the latter can produce ; but his evidence is sufficient for the plaintiffs to show a debt existing at the time of the marriage agreement. The judgments confessed by Thompson are evidence not only against him, but as they may affect the interest of his wife in the property in question, to show the indebtedness of Thompson at the time of the agreement. (Hinde v. Longworth, 11 Wheat. 210.) Taking the judgment in connexion with the testimony of Mr Fisher, you will probably think the plaintiffs' case so far made out as to estab ish the existence of a valid legal debt due plaintiffs by defendant at the time of the marriage settlement, and no evidence being given to impeach the claim, we think, in point of law, it is so, unless you feel at liberty to discredit Mr Fisher ; though Mrs Thompson is no party to the judgment, it is evidence to affect her claim.

[Magniac and others v. Thompson.]

"This brings us to the main question of the validity of the marriage settlement, on which the cause must turn.

"It is good between the parties, and good as to all the world, unless it is liable. to impeachment for fraud ; which is of two kinds, fraud in fact, and fraud in law.

"The first is an intention or design to defraud, delay, injure or prevent creditors from receiving their just debts, by a sale, deed, settlement or agreement, by which the property of a debtor is withdrawn, or attempted to be withdrawn, from their reach. The English statute of 13 Eliz. declares all such acts null and void as to creditors; this statute is in force here, and you will consider it as having the same effect in this cause as a law of New Jersey ; the common law makes the same declaration, and if the evidence brings this case within it, your verdict must be for the plaintiff. Proof of fraud may be made out by direct evidence, or may be inferred from such circumstances as will justify that inference ; but a jury ought never to presume it without either ; you ought to be satisfied that the facts before you indicate and reasonably prove the existence of that dishonest fraudulent intention, which brings the case within the true spirit and meaning of the law. A mere doubt or suspicion of the fairness of the transaction ought not to be sufficient to lead to the finding of any act to be fraudulent, unless the conduct and situation of the parties, and the effects intended to be produced by the act, appear inconsistent with their integrity, and admit of no reasonable interpretation but meditated fraud, to be effected by the agreement, sale or deed; on this subject the law does not remain to be settled by this court; it is laid down by Judge Washington, and adopted by the supreme court in the case of Conard v. Nicholls, 4 Peters, 295, 296, 297, and must be considered as binding on court and jury in deciding on this part of the case.

"To taint a transaction with fraud, both parties must concur in the illegal design ; it is not enough to prove fraud in the debtor ; he may lawfully sell his property with the direct intention of defrauding his creditors, or prefer one creditor to another ; but unless the purchaser or preferred creditor receives the property with the same fraudulent design, the contract is

valid against other creditors or purchasers who may be injured by the transaction. The declarations or admissions of the debtor, as to the object intended to be effected, are evidence to contradict his answer to a bill in chancery, brought to annul the act alleged to be fraudulent, but not to defeat the title of the grantee or person claiming under it, or to have a bearing on the whole case. 2 Peters, 119, 120; Venable et al. v. Bank of the United States, 2 Halst. 173, 174, S. P. Before you can pronounce this marriage agreement void and inoperative, on the ground of actual fraud, you must be satisfied not only that the defendant made it with design to defraud his creditors, but also that Mrs Thompson, and her father and trustee, Mr Richard Stockton, participated and concurred in the fraud intended; if they were innocent of the combination, it would be harsh and cruel in the extreme to visit on her the serious consequences of her intended husband's acts, and as inconsistent with law as justice.

"The facts of the case are neither complicated or contradictory; affording evidence much more clear and satisfactory than usually appears in such cases; it appears that John R. Thompson, after residing some time in Canton, left it in March 1825, and returned to this place in June following; that he paid his addresses to Miss Stockton during the summer, contracted an engagement of marriage with her, and contemplated making a settlement upon her as early as September. That the marriage articles were executed on the 19th December, and the marriage solemnized a few days afterwards, or perhaps sooner; he built a house on the lot mentioned in the agreement at an expense of thirteen thousand dollars, furnished it at the expense of five thousand dollars, but invested no part of the forty thousand dollars during the lifetime of Mr Stockton. In September 1829, he put into the hands of Captain Robert Stockton, who succeeded his father in the trust, securities to the amount of nine thousand five hundred dollars, on account of the sum to be invested pursuant to the settlement. From the evidence of Mr Fisher and Mr Mackie, it appears that Mr Thompson was worth, say in December 1825, about eighty or ninety thousand dollars in money and personal property, and

owed seventy thousand five hundred dollars, of which seven thousand five hundred dollars were on his own account due in Canton, and paid by Mr Fisher.   The residue was the sixty-three thousand dollars borrowed by Mr Fisher on the 22d November and the 2d December 1825, from the plaintiffs on the credit and on the alleged authority of Mr Thompson, but entirely for the use of his father, Edward Thompson, in order to complete the cargoes of his ships then at Canton short of funds. We have no evidence of any other debts which would materially diminish the sum which he was estimated to be worth. This large debt was contracted, not by any specific, but general directions or orders; it was unknown to him till the spring of 1826 that such a debt existed, and therefore could not have been in his contemplation when the marriage articles were executed; they could not have been entered into for the purpose of defrauding the plaintiffs, and he appears to have had no other creditors unless those who were paid by Mr Fisher, in Canton, out of Thompson's funds in his hands.   The security given to the plaintiffs exceeded the amount of the respondentia bond twenty-three thousand three hundred dollars, which may fairly be presumed to have been invested in the invoices pledged to the plaintiffs out of his own funds, as there is no evidence that this sum was raised by loan on the goods purchased on credit.   This added to the other debts, amounting to seven thousand five hundred and forty-eight dollars, makes thirty thousand seven hundred and forty-eight dollars, which would seem to have been raised without contracting a debt. Defendant pledged twenty-three thousand three hundred dollars of this to secure the plaintiffs for a loan made for the use of Edward Thompson, and made Thompson personally liable in the bond.  If the contracting a debt in this manner, by which there could be no profit but commission, and might be attended with heavy loss, was intentional fraud, then you will judge whom it could have been intended to defraud, Magniac or Thompson; if there was any part of the debt lost, it must fall on the latter; the former could not suffer unless the proceeds of the two invoices produced less than sixty-three thousand dollars, and Thompson became insolvent; if, under such circumstances, you find that there was meditated fraud, it will

be hard to discover a motive which could operate on the mind of the defendant to his own benefit, or injury of the plaintiffs.

" This debt not being contracted personally by Mr Thompson or his special directions, it would be difficult to infer any fraud in him in borrowing the money, and still more so in his agent, Mr Fisher; it cannot well be doubted that it was the intention of the one, in conferring the authority, and of the other, in executing it, to comply with every stipulation for repayment, or that in entering into this agreement of marriage, all parties were ignorant of the existence of the debt. The mortgages of the invoices of eighty-six thousand dollars for security, is most powerful evidence to negative fraud of any kind; these are the most material, and probably all the facts of the case, necessary for your consideration of the question of fraud in fact; you will apply the law as read and stated to you to the evidence, and decide according to your convictions of the justice of the case. As a question of fact, it is for your exclusive decision; the court, however, think proper to say, that in their opinion, an inference of intentional fraud would be a very severe comment on the conduct of the parties.

" If, however, you should be of opinion that there was such fraud attending this transaction as brings it within the legal principles laid down for your guide, you will find accordingly a verdict for the plaintiffs.

" Another part of the issue which you are to decide is, whether the defendant has concealed, and has in his possession, disposal or command, any part of the property he owned in 1825, amounting to eighty or ninety thousand dollars, which has been accounted for as by statement of Mr Fisher and Mackie, leaving the sum of twenty-five or twenty-six thousand dollars, which has been shown to be invested in the house furniture and securities in the hands of captain Stockton; connecting this with the evidence of Mr Norris, you will be able to decide whether defendant has any means of paying the plaintiffs' debt, of which he has not given an account, or which remain in his hands.

" In tracing through the evidence the conduct of the defendant towards the plaintiffs in relation to this debt, you will discriminate between the deliberate design to defraud by secreting pro-

perty for his own use, and losses incurred by casualties and want of prudence or discretion; on this part of the issue you are to inquire only as to the property which he actually has in his possession or control, not into what he ought to have had, or what he has disposed of for any other use than his own; and will not take into consideration what has been expended or applied towards the marriage contract, that being the subject of the first inquiry, which is altogether distinct from this.

"The next and most important question is, whether the marriage contract is fraudulent in law, and for that reason void as against the plaintiffs; that is, although the intention of the parties was fair and honest, and the act done without any design to defraud, the policy of the law forbids its execution, and takes from it all legal efficacy as to the creditors of John R. Thompson. The deeds, gifts, grants or other contracts, which the law avoids, are those made with intent to defraud, hinder, delay or injure creditors; and in order to avoid them, both the party giving, and the party receiving, must be participating in the fraud. On this subject, the law is written and cannot be misunderstood. The sixth section of statute Eliz. ch. 13, provides that the act shall not extend to any interest in lands or goods and chattels made on good consideration, bona fide lawfully conveyed or assured to any person not having, at the time of such conveyance or assurance to them made, any manner of notice or knowledge of such fraud, covin or collusion.

"The words of the law require that both parties must concur in the fraud, in order to bring the case within its provisions, and such has been its settled judicial exposition for two hundred and sixty years.

"There are in law two kinds of considerations; good, which is natural love and affection; and valuable, which is money or marriage. The word good is used in this law as applied to cases which it does not mean to embrace; but from the evident meaning and object of the law, to protect creditors from the disposition by debtors of their property with intent to defraud them, and from dispositions which might produce that effect by conveying it to their wives, children, relations or friends; all courts, both of law and equity, have considered the word good as meaning valuable consideration.

"You will perceive that the law, as thus expounded, embraces three kinds of conveyances:

" 1. Those made with the intention in both parties to defraud creditors; these are void, whether made with or without consideration, good or valuable, not only on account of the covin or collusion, but as exempted from the saving of the sixth section, not being bona fide.

" 2. Voluntary, made for good consideration, but tending to defraud creditors; if they are permitted to have a legal operation to vest the property conveyed, the policy of the law makes them void for legal fraud—though there is no fraud in fact, the fraud in law, being deemed equivalent to it.

" 3. For valuable consideration, in good faith, without notice by the person receiving the conveyance of any fraud, covin or collusion by the grantor to defraud his creditors; these are excepted from the operation of the law before referred to; they are good and valid at common law to pass the property conveyed, and purchasers under such conveyances are entitled to, and receive the protection of all courts of justice. From what has already been given you in charge on the subject of actual fraud, you will be enabled to decide whether this 'case comes within the first class of cases of intentional fraud in both parties to the marriage contract; if you are not satisfied that this contract is of this character, then it cannot fall within the second class of voluntary conveyances. If it was made in contemplation of marriage, it was made on a valuable consideration, and puts the intended wife on the footing of a purchaser for money, and not of a voluntary grantee or donee for the mere consideration of love and affection. She is not to be considered in any court as a volunteer, but comes into court at least on an equality, both in law and equity, with any other parties whose claims are founded in money. You will not forget the difference between a provision for a wife and children before and after marriage; when there is no portion or money paid, it is the difference between a purchaser and a volunteer, for the former the consideration is as valuable as the debt due a creditor, or the money received from a purchaser in the latter; it is, from its nature, merely voluntary; there can be no other than a good consideration for making it; there

[Magniac and others v. Thompson.]

exists, it is true, a moral obligation to provide for their support and comfort, but that moral obligation must yield to the legal one, which every man must observe towards those who have just claims on his property. In dispositions of property which take effect in the disposer's lifetime, as well as after his death, there is a golden rule which applies to all—a man must be just before he is generous; this applies to all cases between volunteers or those claiming merely by a voluntary disposition, made by deed or will to those who have no legal claims on the person who makes it on the one hand, and creditors and purchasers on the other. But where conflicting claims between creditor and creditor, purchaser and purchaser, or purchaser and creditor, arise in court, they are settled by other rules. The first inquiry as to them is, whether one class has a legal right to the debt claimed, or the other to the thing claimed to be purchased, such as is recognized in a court of law; the second is, whether that right has been so acquired as to be attended with such circumstances of fraud, accident, mistake, trust, inadequacy of price, or unfairness, as will annul or modify it in a court of chancery, according to the established principles of courts of equity.

"Creditors have, as between them and the debtor, an undoubted right to so much of his estate as will pay their debts; but the debtor has a right, equally undoubted, of preferring one creditor to another, or giving all his property to one; this is neither fraud in law or fact in the absence of covin or collusion. A debtor may sell his whole estate, turn it into money, and distribute it among his creditors at his pleasure; those only who have liens on it, can, in either case, have any resort to the property in the hands of a bona fide purchaser or creditor, who has fairly received it in payment of his debts. These are known principles of law, long settled and established by universal consent and adoption in our system of jurisprudence; they form rules of property and title on which the peace of society and security of rights essentially depend; they cannot be shaken by courts or juries without producing endless confusion, uncertainty, and want of confidence in the administration of the laws of the land.

"We will then apply them to the case under our considera-

tion, in order to ascertain, by their bearing on its merits whether it comes within the third class of cases, which, we have seen, are excepted from the provisions of the statute.

"A contract in consideration of a future marriage, is of that nature which creates a legal and equitable obligation on the parties to perform it, in good faith, according to its stipulations; the consideration is good and valuable in contemplation of the law, as if it was made on the loan or payment of money; if the contract is executed, the parties become purchasers; if it remains executory till after the marriage, they become creditors on its consummation, or assume pro tanto the character and acquire the rights of both, if executed only in part. They are entitled to the protection of all courts in the enjoyment of what is granted, and to their aid in enforcing the performance of what has been stipulated to be done, and where either party can rightfully call on a court of law or equity to compel the other to perform an act necessary to the execution of the contract, and the judgment or decree of the court would be given in his favour, a voluntary performance of the legal or equitable obligation would be equally valid. The consideration being valuable if the contract, whether executed or executory, is made in good faith with one having no notice or knowledge of any fraud, covin, or collusion to defraud creditors, performance may be enforced or voluntarily made, and the contract carried into execution at any time, either in the whole or in part, as is in the power of the party; and whatever is so done, will be as valid and binding between the parties and in relation to third persons, as if the execution had been completed on its date. The law is express in referring to the time of the conveyance and assurance, and embraces not only perfect grants or gifts, but any estate or interest in lands, goods and chattels, made, conveyed or assured. On these principles it is the opinion of the court, that the evidence in this case brings the marriage contract within the sixth section of the law, excepting it from the operation of the first section, unless you shall find that it was made, not bona fide, or with notice or knowledge of a fraud in John R. Thompson in entering into it, brought home to his intended wife, and that Thompson actually entered into it with such fraudulent, covinous or collusive intention.

[Magniac and others v. Thompson.]

" If you do not find such want of good faith or existence of notice, then Mr Richard Stockton must be considered at law as a purchaser for valuable consideration, bona fide, and without notice, so far as the contract has at any time been proved to have been executed by Thompson, and his creditor, so far as remains to be executed, and Mrs Thompson as having the same character in equity, and captain Stockton as invested with all the rights and standing, in all respects, in the situation of his father.

" The aspect in which these considerations present the case, is a contest between Mr Stockton and Mrs Thompson, the one the legal, and the other the equitable purchaser of the house, furniture and securities from John R. Thompson, by the contract and in consideration of the marriage, and the lot as the marriage portion, and the plaintiffs, his sole creditor. Thus they stood at the commencement of this suit, and as creditor at the time of the contract and consummation of the marriage, they having performed their stipulation, had a perfect right to call on Thompson, both at law and equity, to perform his. If Mrs Stockton is a purchaser, she is one of the most favoured class; the consideration she has given is as valuable and as much to be valued as money; it is not necessary to consider it as more so; if she is invested with the acknowledged rights of a money purchaser, a conveyance of real or personal property made to her before marriage, by her intended husband, of real or personal estate, would be as valid and effectual although he was in debt as if he was not. If he had the legal title to the thing conveyed and power to sell, the interest and beneficial use would vest in her and her trustee, by the deed, as fully and completely, if the property had been held in trust for others, as if Thompson had a right as perfect in equity as at law, provided she had no notice of the trust. This is a universal principle never questioned, and protects all bona fide purchasers for valuable consideration without notice, before the money paid or the condition of the grant performed.

" The application of this well known and acknowledged rule of law to Mrs Thompson does not make her a prerogative or a privileged purchaser; it only puts her on the footing of every other purchaser, from one who has the legal title, subject to

an unknown trust, for the use of a third person. This case is of the strongest kind against the cestui que trust, if the plaintiffs can be so considered, and they cannot be placed in any attitude which can give them better rights than in that, for the debt was contracted with them but a few days before the date of the marriage articles, and in a quarter of the world so distant as to preclude the possibility of notice to other parties. In the common case of a trustee, conveying the legal estate to the injury of cestui que trust, the trust exists at the time of the conveyance, it is necessarily known to the trustee, and notice may be brought home to the purchaser by direct or circumstantial evidence, as in all other cases; but in this it could be done by no possibility.

" When the law is so well settled, as in the case of a conveyance by a trustee to one having no notice of the trust, it can have no effect to urge any arguments of hardship on the person injured; we could not change the law on the subject if we would, and should violate our duty not to so declare it. It is a hardship on a widow or an orphan who has been defrauded by her trustee, in selling what is not his own, but theirs; but it is great, if not a greater hardship on the widow or orphan to be deprived of property which they have purchased and paid for by money earned by their industry, and deprived of that on the faith of which they have devoted their lives to a husband, and placed at his disposal their future happiness and last cent. A loss must fall on one of two innocent sufferers, whose claims may be supposed equal in justice and equity; in such case the law leaves the property with the one who has acquired the legal title by fair purchase in good faith and without notice; and a creditor of a fraudulent debtor, who sells or settles on his intended wife property which he is bound both in law and equity to apply to pay his debts, can on no principle be more favoured in any court than the person whose property is unjustly conveyed by a trustee to pay his own debts, to rob one family in order to save another, or secure a provision for an expected one of his own. A creditor is no where more favoured than the infant, the ward, the widow or orphan, whose property is in the hands of trustees, without lien or security, and subject to his disposition by deed or bill of sale.

[Magniac and others v. Thompson.]

"The creditor of a deceased debtor has the same right to the payment of his debt out of his property as a living one; yet a sale of the personal property of a deceased, by an executor, administrator or trustee, to pay his own debt, is good against creditors, the widow and next of kin, if made without notice or collusion, and no court of chancery will annul it; yet it is as much a breach of faith, as deep a violation of moral honesty, as to settle the same property on an intended wife, to whom he was under as high and imposing obligations to perform his contract of marriage, by paying the promised consideration on which it was solemnized, as to discharge a bond given for money lent or property purchased.

"These are general principles and rules of law which, we feel confident, are the pre-existing law of this case, and, as such, lay them down to you as the legal rule for your verdict; we should *make*, instead of expounding the law, act as legislators of new rules, and not as judges, expositors and administrators of old and well established ones, in declaring that Mrs Thompson is, in this case, to be viewed in a less favoured light than a purchaser in consideration of money or property.

"The consideration of the contract on which this cause depends, is both marriage and property; the value of the one cannot be, and the other has not been ascertained in dollars, but we think the justice of this case can be attained without doing either; considered as a purchase made in good faith, and the purchase money paid without notice of any fraud by the intended husband, we know of no principle by which it can be declared void in a court of law; we know of no case in which a conveyance of real or personal property so made, has ever been, or, agreeably to legal principles, could be annulled and set aside on any reason founded on mere inadequacy of consideration. All that is required to render a conveyance valid at law in that respect is, that there be some consideration, the amount is not material, and cannot be inquired into either as respects the grantor, his creditors, or subsequent purchasers of the same property, in the absence of actual and legal fraud in the grantor, or notice of it to the grantee. The only resort of the parties who complain of any equitable fraud, or other circumstances which would invali-

date it in equity, is to those courts, they only can decide upon the inadequacy of a pecuniary fund, or the equality of marriage to a given sum of money, or value in property, under the circumstances of the case. Cases may exist in which a court of chancery would compare and estimate them, for the relief of a creditor, a purchaser, or perhaps the party, in a strong and clear case of injustice; when such a case occurs it will be time to give an opinion on it; as yet we know of no instance in which a court of chancery have set aside a purchase for a valuable consideration, or a marriage contract, when made bona fide, and without notice of fraud or defect of title; those claiming under them have ever been the peculiar favourites of such courts, and their rights can never be disturbed, unless in some extreme case of such a nature as to call for the application of old rules and principles to a new state of facts, which have never yet been presented to a chancellor. Truth is not to be elicited by forced comparisons and extravagant suppositions, or extracted from extreme cases of rare and barely possible occurrence; the rules of law have been settled to meet the common and ordinary occurrences of life, which come within the cognizance of courts of justice; extreme cases may arise, and though necessity may have no law, yet there are rules for all exigences, but they are only to be app led when they arise; they differ much from those which regulate and govern the ordinary common contracts of society. The court perceives nothing in the one now under our examination, which gives it any unusual features. At the time it was entered into, if you view the evidence as we do, Mr Thompson, so far as he could judge, was abundantly able to make the stipulated provisions for his intended wife, without doing any injury to the plaintiffs or any other person; he has given evidence of losses enough to account for his inability to comply either with his contract with his wife or plaintiffs, but they were unforeseen at the time; they happened not by his dishonesty or even imprudence. An investment was made by his agent without his knowledge; the money was borrowed; the purchase and shipment made by Mr Fisher, in good faith, and in the exercise of sound discretion. But what cost eighty-six thousand three hundred dollars in Canton, produced less or

[Magniac and others v. Thompson.]

not more than forty thousand dollars in Philadelphia; it has been a calamity by which the defendant has suffered and must suffer; his wife must lose thirty thousand dollars of her settlement, or the plaintiff lose twelve thousand dollars of his debt; even admitting their equities to be equal, she has a legal advantage which no court can take from her, unless her conduct can be impeached for actual or legal fraud; it would be as unjust as illegal and inequitable, to visit alone on her the misfortunes which attended her husband's affairs. Considering Mrs Thompson then as a purchaser under the marriage articles, we are decidedly of opinion, that there is no legal fraud attending the transaction which would invalidate it in a court of law, or any matter given in evidence which would impair its obligation in a court of equity; the nature of the issue seems to us to require both views to be taken. If Mrs Thompson cannot be viewed as the purchaser of the property contracted to be invested for her use, she is certainly a fair and honest creditor from the time of its execution, if not from the time of the proposed settlement in August, after the engagement of marriage was made; if she was a creditor on the 19th December, Thompson had a right to prefer her in preference to any other creditor to the extent of his whole property, whenever he could realize or reduce it into possession. The mere priority of the plaintiff's debt, in point of time, gave him no such legal or equitable priority of payment as to prevent the marriage agreement f om having a legal efficacy on the parties; though Mr Fisher had a previous authority to contract it, it could not cut out the inchoate rights of Mrs Thompson, by the engagement and proposed settlement in the summer of 1825, which, you may fairly infer from the agreement, was in the course of execution, by Thompson having begun to build a house on the lot of which Mr Stockton was to stand seised in trust before the date of the articles; and the deposition of Captain Stockton is, that it was built in 1825 and 1826. These circumstances may be thrown out of view on both sides, and the rights of the respective parties be tested at the time of the consummation of their respective contracts; that of the plaintiffs on 22d November and 2d December, and Mrs Thompson's on the 19th: if they were both fair creditors, Mr

Thompson had a clear undoubted right to prefer either, and pay the whole debt out of any property on which the other had no lien; and we are of opinion, that she might be considered as a fair creditor to the amount of the promised settlement, made under circumstances which, we think, wholly insufficient to justify its being rescinded, in whole or in part, in a court of law or chancery, unless it was attended with actual fraud. If it had comprehended his whole estate, and the certain consequence of being carried into effect, or the intention of the parties had been to exclude the plaintiff from the payment of his debts under cover of the agreement, on the equity side of the court we would give him relief. But this case seems to us to have no such character; the intervention of unexpected losses alone, and neither the effect of the agreement or the intention of the parties have produced the existing state of things, which, if not changed by your verdict, and our judgment, will leave the parties thus. The plaintiff's debt was nominally sixty-three thousand dollars; the sum actually received by Mr Fisher sixty-one thousand and two dollars, bearing an interest of per cent, of which he has received all now due, principal and interest, except about twelve thousand dollars; that of Mrs Thompson, estimating the house and furniture at eighteen thousand dollars, amounts to fifty-eight thousand dollars, of which there is yet due thirty-five thousand dollars, if Morris's debt is not good, or thirty thousand five hundred dollars if it is good, besides interest from December 1825. Though this, in equality of loss, might and would not be of any importance to her in a court of law, it would be a powerful circumstance in a court of equity, to which the plaintiff would apply for relief from alleged hardship. The time at which the contract was made, and the circumstances then attending it, connected with the situation of the parties at that time, furnish the proper criterion by which to ascertain their respective rights; if they have changed by events happening since, and are to be governed by their situation at the commencement of the suit; it is important to view the change of the marriage contract. Instead of withdrawing the forty thousand dollars, to be invested for the use of Mrs Thompson, it has been reduced to five thousand dollars certain, or nine thousand five hundred dollars con-

tingent; had this been the original stipulation, it would hardly have been deemed an unreasonable or disproportionate consideration for the marriage; of the sum promised, and interest, she will in no event receive more than one fifth, and possibly only one tenth from the wreck of Mr Thompson's property, while the plaintiff has received more than the half of what remained due him, after deducting the proceeds of the two invoices, of which no part went to Thompson or his wife, but the whole was applied to the plaintiff. It is also an important matter, as it affects the character of the two contracts at the time they were made, that Thompson gave no security, and pledged no specific fund for the investment of forty thousand dollars, but as security for the repayment of an actual loan of sixty-one thousand and two dollars, the plaintiff received as security goods of which the prime cost was eighty-six thousand three hundred dollars.

" This view of the merits of this cause seems to the court to be sufficient for the decision of the points directly at issue; others have been made, and ably argued by counsel on both sides, but we are not disposed to trouble you with a discussion not necessary to a correct decision of the question between the parties. The cause has been tedious, and its examination sufficiently laborious; we shall not, therefore, investigate the doctrine of voluntary conveyances or contracts of marriage made after it has been consummated, they not partaking of the character of purchases in consideration of money or marriage. In the first class of cases, the existence of debts due by the grantor at the time of the deed or contract, has a very important, if not decisive bearing on their validity, as to creditors; the law is not clearly settled, so as to their effect on subsequent purchasers. But it has never been decided that a deed conveying to a bona fide purchaser, or an intended wife, is in any manner impaired by the mere existence of pre-existing debts, and to this class of cases alone it is necessary for you or the court to direct their attention.

" The rules which we have expounded to you, as controlling this cause, are such as are founded on principles which are assented to by counsel on both sides, they differing only in their application; there can, indeed, be no other question, if

Mrs Thompson is to be considered as a fair purchaser without notice, or an honest creditor; her claims can only be affected by fraud in a court of law, or such a case of equitable jurisdiction as could induce a court to annul a conveyance, made in consideration of money, or as security for a debt, or enjoin the assertion of any right accruing or claiming under it. The importance of the principle involved in this controversy, made it our duty to examine it at large, and as the sum in dispute authorizes either party to take the cause to the supreme court for revision, we have given an opinion explicitly, so that the law may be fairly settled. We conclude, then, with instructing you that a settlement made before marriage, makes the intended wife a purchaser; if agreed to be made, she is a creditor, and protected in the enjoyment of the thing settled, and entitled to the means of enforcing what is executory, if the transaction was bona fide and without notice or fraud. The plaintiffs have made an objection to the operation of this deed for the want of evidence of delivery; this is a question for you to decide; the evidence is sufficient to prove it, if you believe the witnesses; the building and furnishing the house are facts tending very strongly to prove the delivery in a satisfactory manner; the law on this subject is well settled by the supreme court, in Carver v. Astor, 4 Peters, 23, 28, 82. You will apply it to this case.

"It has been said that the contract of settlement has been abandoned; it is not to be presumed, and we think the facts given in evidence do not amount to it; every act contemplated to be done by either party, has been performed, except making up the investment; the omission to complete it is not in itself sufficient to authorize you to find that the whole contract has been rescinded; so far as it has been executed, it is not open to any presumption of the kind, and the allegation of abandonment seems to be inconsistent with the charge of alleged fraudulent intention to defraud the plaintiffs. You may find, if you are satisfied with the fact, that the payment of the balance of the forty thousand dollars has been waived by consent of the parties, but this can have no effect on the investment actually made. The non-delivery of the securities for the nine thousand five hundred dollars, till near the time when judg-

[Magniac and others v. Thompson.]

ment was rendered in New Jersey, and the omission to record
the marriage articles, have been relied on in aid of the pre-
sumption of abandonment; but under the circumstances of the
case, we do not think they conduce to prove it, (the case last
referred to seems to settle this point, 4 Peters, 24, 98, 99) and
nothing appears from which an inference can be drawn that
Mrs Thompson, for whose benefit this contract was made, has
done or consented to any act which could impair her rights
under it; the omissions of her trustee to enforce the payment
of the money, or to record the deed, cannot be deemed a waiver
by her.   If the trustee had done any acts inconsistent with
the agreement, it could not affect the legal validity of her
rights, and the acts of a parent will not be construed to be so
unless clearly intended.   4 Peters, 93, 95.

"The court have been requested to charge you, that in
point of law, the covenant on the part of Mr Richard Stockton
to stand seised to uses, operated as an immediate conveyance
to his daughter before marriage, and that by the marriage,
Thompson became the owner of the furniture in his own right,
and had the exclusive use of the house and lot unincumbered
with the trusts of the agreement.   By the covenant contained
in that agreement, Mr Stockton was not to stand seised to the
use of his daughter till after the marriage; if it is the under-
standing of the plaintiff's counsel that there is any evidence of
any other covenant than this, we are unable to perceive it.
The deposition of captain Stockton is positive, that his father
did not convey, but covenanted to stand seised of said lot
(prout deed); this does not even conduce to prove there was
any deed independent of the marriage articles, and evidently
refers to it, which the court instruct and charge you, as matter
of law, does not operate by the statute of uses, 27 Henry 8, to
pass the legal estate to the lot or any other property referred
to in the agreement to Mrs Thompson or the defendant.   It
remained in Richard Stockton during his lifetime, devolved by
his death on his heir at law, Captain Stockton, and now re-
mains in him on a trust executory; it never was and is not
now one executed by that statute.   It is unnecessary to explain
to you the reasons of this opinion, as it would perplex your
consideration of the case with a dry detail of abstruse princi-

ples, neither amusing or instructing to any persons, except those whose professional or judicial duty may lead them to the investigation; as a sheer question of law, you will probably not be disposed to investigate it for yourselves.

" The court are also requested to charge you on three other points of law. 1. That the expenditure of five thousand dollars in furnishing the house is per se fraudulent on creditors; we think not: furniture is part of the marriage contract, to be provided by Thompson in a suitable manner, as he should think fit. He had a discretion which he might exercise in a reasonable manner, according to their station and associations in life, proportioned to the kind of house and extent of income, the trustee or wife could not, in law or equity, compel Thompson to furnish it extravagantly or at useless and wanton expense, and if he should do it voluntarily, it would not be within the true spirit and meaning of the marriage articles, and might be deemed a legal fraud on creditors as to the excess. But before we can say that it is a fraud in law to expend five thousand dollars in furnishing a house costing thirteen thousand dollars, and the establishment to be supported by the income of an investment of forty thousand dollars in productive funds, we must be satisfied that it is, at the first blush, an extravagant and unwarranted expenditure under all the circumstances in evidence, and to an extent indicating some fraudulent or other motive unconnected with the fair execution of the contract, of which we are not satisfied; and therefore cannot charge you as requested by the plaintiff's counsel, there being no clear abuse of the discretion confided by the contract to Mr Thompson. A less expenditure on both house and furniture would have been more prudent and discreet in the situation of the parties in 1826, when the house was finished; something could have been saved for investment if less expense had been incurred, and eight or ten thousand dollars been made productive. Had this been done, there could have been little ground of complaint by a creditor; but as to him it was immaterial how the money was expended; his only concern was in the amount, not the objects of the expenditure, so that they were according to the terms of the agreement; whether a given sum was applied to one object or the other, or fairly proportioned

among them, affected only the parties, not creditors. 2. We are next asked to charge you that the delivery of the notes to captain Stockton, in September 1829, was a fraud; if it was done in order to comply, in part, with the agreement, it was not so; if it was colourable, made with the intention of covering and concealing so much under pretence of the marriage articles for Thompson's use, and so received by the trustee, it was legally fraudulent as to creditors, but if delivered with such intention, and not so accepted, then captain Stockton might not only fairly apply it to the trust fund, but was bound to do so. Though it may have been done on the eve of the judgment confessed in New Jersey, that would make no difference, it being to carry into effect the agreement of December 1825; had it been to make a new settlement after marriage, if it was in consideration of a portion or property, it would not have been fraudulent per se; and the time which intervenes between the making provision for a wife, and the contracting the debt or obtaining a judgment against the husband, is not a matter which per se makes it a fraud; it may or may not be suspicious, and connected with other circumstances as evidence of it. 4 Wheat. 506, 507, 508.

"The remaining point on which the charge of the court is requested, is, that the marriage agreement is void, because not recorded within the time required by the law of New Jersey for recording deeds. The covenant to stand seised to the uses declared would come within this law, if the uses were executed by the statute so as to make it an actual conveyance or deed passing the legal estate, but being executory, it is only a covenant giving an equitable estate to those for whom the trust was created and continues, and not a deed. But considering it as a deed, the want of recording does not make it void as between the parties, though it would become void as to the creditors (perhaps) and purchasers from Richard Stockton without notice; but the omission to record it is no fraud on plaintiff, and cannot affect him; not being void as between the parties, it gives to John R. Thompson no other estate or interest but such as arises from the trust; he cannot be entitled to any legal estate or interest under it incompatible with the nature and terms and objects of the trust; our instruction,

[Magniac·and others v. Thompson.]

therefore, is, that the marriage contract is not void for want of being recorded in time.·

"·The principles of law which have been thus expounded to you as the guides to your verdict, are all which are deemed by the court or counsel to be applicable to the merits of this case, or necessary to be· understood, in order to decide it correctly; they form what, in our judgment, is the pre-existing law of the case, and have been extracted from judicial decisions which afford to our minds conclusive evidence of their wisdom and justice.    The rules laid down are not new ones, either here or in that country which is the source of our jurisprudence, and ·to whose judicial tribunals the wisest and best judges will look without any fear of foreign influence; to some with veneration, and to all with respect, as the 'expositors of the same common law which originated there, and, adopted in this country, is the source of national pride to both, as a system equally distinguished for its wisdom and public benefits.    It has not been thought necessary to cite to you all the particular cases in which judges have established these·principles, or refer you to the time of their application, as the nature of the cases decided may have led to their development; this is more proper in courts of error, or in deciding in others, questions referred solely to the court.    The course pursued saves you much time, and relieves your minds from much perplexity; it does not produce any injury to the parties; it saves you from a comparison between the character of the courts and judges, who may have given judgments or opinions, settling and declaring the rules of the common law or the construction of statutes.    Whether we have, in forming our judgment as to the law of this case, drawn from the old and pure fountains of our jurisprudence, or the muddy rivulets which flow from them, need only be decided by that tribunal to whom none appeal without full confidence that it will in justice give such judgment as will correct all the errors of inferior courts.    You will not be willing to confide more in your own judgment to correct any mistakes which this court may have committed in the instructions they have given you, than in that of the supreme court, to whom either party may submit this cause.    Let our judgment be what it may as to the law, it can do harm to no one without their sanction; with

[Magniac and others v. Thompson.]

their approbation a safe rule of titles and property will be established; your judgment might not lead to one so sound or permanent. Much of what you have heard, has been repeated from the adjudication of that ourt, much from those of England, their judges and chancell rs, whose judgments, decrees and opinions have been carefully reviewed and approved by the pure and eminent jurists who have presided in our own courts. If, in following the path which they have pursued in the administration of justice, this court looks abroad as well as at'home for light and knowledge to guide our course of legal investigation, it has been and will continue to be done without the fear of being misled by example, or the self-reproach of, adopting in our or inculcating in your minds, principles unsound in law, or dangerous in their moral tendency."

The case was argued by Mr C. J. Ingersoll for the plaintiffs in error, and by Mr Binney for the defendant.

The counsel for the plaintiffs made the following assignment of errors:

The charge of the court instructed the jury that under the circumstances in evidence, the law is against the plaintiffs; that the marriage settlement in question would be valid unless all the parties thereto were guilty of fraud; that marriage is a sufficient consideration for settlement; and left to the jury nothing to find by their verdict, but whether the defendant's wife and father were equally guilty with the defendant in the alleged contrivance to defeat the plaintiffs; arguing, as the charge does throughout, that the verdict should be for the defendant.

He also submitted in argument the following points of law.

1. The settlement covenants that the grantor should furnish the house in a suitable manner as he should judge suitable and proper. As he proved insolvent, and unable to comply with the other terms of the settlement, it was contended for the plaintiffs that five thousand dollars was a fraudulent investment in furniture; on which the jury were to pass their

[Magniac and others v. Thompson.]

verdict. The court rejected this view, assumed to determine that the sum was proper, and would not permit the jury to pass upon it.

2. The settlement covenants that the grantor would in the space of one year from the time of the marriage place out on good security, in stock or otherwise, the sum of forty thousand dollars, and hand over the evidences thereof to the trustee. This covenant was never fulfilled. But some years afterwards, when the trustee was dead, on the eve of the judgment confessed by the grantor in New Jersey, he passed over two promissory notes for nine thousand five hundred dollars, together, to the son of the trustee, in performance as was said of the settlement in part. This was contended for the plaintiffs to be fraudulent, and as such to be passed upon by the jury. The court overruled this position, and charged that unless the notes were both delivered by the grantor and *accepted by Robert Stockton*, with fraudulent intentions, the transfer is good.

3. As the deed of settlement was not registered till after the plaintiffs' judgment in Jersey against the defendant, it was insisted for the plaintiffs, that pursuant to the express provision of the statute of New Jersey, in that case, the prior judgment prevails over the subsequent settlement. The statute of uses, 27 Eliz. ch. 10, annexes the possession to the use; the lot and house held by Richard Stockton, in trust for his daughter, became her property, which the husband reduced into his possession; and the plaintiffs' judgment binds it, notwithstanding the subsequent marriage settlement. This was also overruled by the court.

Mr Ingersoll contended:

The plaintiffs are prior creditors. There was no contract for a marriage settlement until a month after the defendant, through his agent, contracted the debt in question to the plaintiffs. The property settled is enough to pay the debt; so that the marriage settlement is the only hindrance, and the question is whether it is an insuperable legal impediment. The philosophy of the law on this subject is simple honesty—to give

every one his own. The English common law, which is our law, differs from the law of all the rest of the civilized world in identifying the wife with the husband. A married woman can own nothing, can lose nothing, can hardly be guilty of a misdemeanour if by construction of law it may be imputed to her husband; whereas in the countries of the civil law, marriage is like a commercial partnership, a firm in which the interests of husband and wife are the same, respecting the joint stock or property. In the great families of England, says Lord Mansfield, it has been found convenient to establish marriage settlements, which luxury and chancery have entrenched behind the principles of the civil law, usurping the free empire of the common law. So long ago as the year 1570, the statute 13 Elizabeth indicates a primitive and proper repugnance to such a contrivance, and endeavours to reinstate the common law, impaired by marriage settlements and other fraudulent conveyances; for which it enacts not only annihilation, but punishment. In defiance however of this resistance of the common law, and the statute law, which is but declaratory of the common law, the English chancellors, who were always interested parties, have built up a system of encroachment and exclusiveness ill suited to American manners, fortunes and institutions. The state of New Jersey by an act of assembly re-enacted the statute of Elizabeth, which itself was but declaratory of the common law, and though American judges are deplorably prone to follow blindly in the ruts of British precedent, yet we may at least claim it as the settled law of this court that we are to be governed by English law before the American revolution, and not to follow them in all the enormities which they are chargeable with since. Cathcart v. Robinson, 5 Peters, 264.

. The case of Campion v. Campion, 17 Vez. 262, may be mentioned as one of those strumpet decisions of the modern English chancery which it is to be hoped do not give the law to this country.

The present is the case of a man in trade, with immense outstanding debts and liabilities, without a particle of real estate, or even of personal, but in mere speculation, who im-

mediately after the marriage·declared his inability to settle the property promised by the marriage settlement, who has not and never had any goods, stocks, credit, property, or estate of any kind, nothing to pledge even if he wanted to borrow, who pleads utter insolvency, who settled on his marriage the very money he borrowed of the plaintiffs, and who now lives upon it in their despite.    Within a month of the crash of his father's immense failure, with whom he was connected in trade, which was an affair of such importance as to be published in the English newspapers, the defendant, by marriage settlement, set apart and now withholds all he could ever claim, and much more than he ever was entitled to.

The question is whether such is a valid marriage settlement. That it hinders the plaintiffs who are prior creditors is beyond all question.    In the court below it was insisted for the defendant that by antenuptial settlement the wife is a purchaser, holding by a consideration equivalent if not superior to the most valuable.    For the plaintiff, conceding this position, it was contended nevertheless that there must be a fair transaction, as well as a valuable consideration, that fraud will vitiate any contract whatever, that even acquittances, bonds, laws, treaties, may be annulled by fraud, and why not the contract of marriage settlement?    The charge sanctioned both these positions; the plaintiffs without reserve, carrying it out in argument ad libitum, and the plaintiffs' position with a qualification which forms the first exception, to wit, that to invalidate a marriage settlement the wife and her father must *combine* with the settlor or husband, and be equally guilty with him of premeditated fraud.    The charge is explicit that there must be not only notice or knowledge, or even participation, but combination and premeditation of all together and alike.

This, it is submitted, is not the law.    The jury were misled in being so instructed.    They should·have been advised that they might find fraud in the husband, and knowledge of or notice to the wife·or father ; and that such a state of things would vitiate the settlement as a fraudulent transaction.    The charge considers, first, fraud in fact ; secondly, the question of property under the special agreement ; and thirdly, fraud in

law, or constructive fraud. The jury supposed, and had reason to suppose, that unless they found the wife and father equally guilty with the husband, they must affirm the marriage settlement as a fair transaction. It even goes so far as to say, in an argument much elaborated to support the settlement, that it would be cruel and harsh in the extreme, and inconsistent with law and justice, to visit the wife with the husband's fraud, unless she concurred in the intention of it, and was guilty of the combination. Now, the law, as expressly enacted by the statute of Elizabeth, and by the act of New Jersey, the common law, the common sense, the obvious morality and reason of the case are, that if either wife or father knew or might have known, or had the least reason to suspect, the husband's fraud, the transaction is altogether fraudulent and void. For it is a question to be determined by the whole transaction, not a part of it. The argument of the charge to the jury puts it to them to ascertain *how much* fraud there was, whereas it is submitted as the law, the reason and the morality of the contested principle, that *any the least particle* of fraud by either party, with any the least notice to the other party, vitiates and annihilates the whole proceeding. The proviso or exception of the sixth section. (Atherly, 212) is to except those settlements which are made on good consideration *and* bona fide without any manner of notice or knowledge of the fraud : and so are the authorities. Cadogan v. Kennet, Cowp. 434 ; Doe v. Rutledge, Cowp. 710 ; Blanchard v. Ingersoll, 4 Dal. 305 ; Geiger v. Welsh, 1 Rawle, 353 ; 1 Roper on Husband and Wife, 298 ; Dewey v. Baynton, 6 East, 257 ; Barrow v. Barrow, 2 Dick. 506 ; Sexton v. Wheaton, 4 Wheat. 507 ; same case, 8 Wheat. 389 ; Hinde v. Longworth, 10 Wheat. 213 ; Johnston v. Harvey, 2 Penn. Rep. 82 ; Garland v. Rives, 4 Rand. 282 ; the two last cases are in point.

In all these cases and on all occasions the question was and must be, was it a fair *transaction*, not *how much* fraud was there in it. In postnuptial cases the law infers fraud. In antenuptial cases it is the question to be tried. It is a question of fact, which a court cannot compel a jury to qualify. The morality which pervades all law, and which is the law

[Magniac and others v. Thompson.]

itself, prohibits. *all* fraud, not merely a *combination* of fraud, and it considers the slightest notice as the fullest participation. Edward Thompson's enormous failure shortly before the settlement, involving John Thompson, must have excited suspicion and inquiry; and the fact is, and such was the plaintiffs' argument on the trial, that Mr Stockton repudiated the settlement, satisfied as he must have become of its invalidity. For the poignancy of the misdirection is that it was a complete surprise: the fact of combination or participation between husband and father never having been suggested or intimated by the plaintiffs' counsel to the jury. On the contrary, their argument was that far from combining, Mr Stockton revolted at the settlement, and refused to complete it. This argument was drawn from the incontrovertible and conclusive facts, that it never was either acknowledged or recorded during his life, but remained a dead letter in family secret, never carried into execution, owing to the settlor's acknowledgement immediately after the marriage that he was unable to set apart the forty thousand dollars stipulated by the settlement to be invested for the use of the wife, or any part of it, being, as he acknowledged, utterly insolvent. Thus his immense debts, large losses, and overwhelming liabilities, becoming known to Mr Stockton immediately after the settlement was signed, and the marriage took place, he did not choose to involve his daughter and himself in the useless odium of such an illegal attempt to deprive creditors of their property. The settlement was therefore cast away, never completed while Mr Stockton lived, never acted upon, and no attempt ever made to realize it, till by the settlor just on the eve of his confession of judgment to the plaintiff, when he had it acknowledged and recorded. All these circumstances the plaintiff had a right to submit to the jury as proof of knowledge or notice, to be inferred, not from participation in the fraud, but repudiation of it. But the court, instead of suffering this view to be presented to the jury for their determination, frustrated it by a misdirection as to combination, which left the jury nothing to find but the fact of combination or a verdict for the defendant.

Even in the definition of fraud the charge misdirected the

[Magniac and others v. Thompson.]

jury by a reference to the case of Nicol v. Conard, 4 Peters, 296; where Judge Washington's attention was fixed on the instance of fraud by one with notice to another, not that of fraud by two or more which is defined covin. Co. Litt. 357, b. defines it as referred to by Judge Washington. But both Littleton in the text, and Coke in the commentary, put instances of individual fraud in which two or more are concerned, as contradistinguished from the fraud of combination, or covin. So does Hardwicke in the case of Chesterfield v. Jansen, 2 Ves. Sen. 155. So does Mansfield in the case of Cadogan v. Kennet, Cowp. 43, where the very case is put of a fraudulent conveyance to an innocent trustee. Such are the cases of Garland v. Rives and Johnston v. Harvey before cited. In the case of the Postmaster General v. Reeder, 4 Wash. C. C. Rep. 683, Judge Washington explains his opinion of fraud actual and constructive; and in the case of Gilman v. The North American Land Company, 1 Peter's C. C. Rep. 464, he individuates it. The charge, it is therefore submitted, annuls the whole law of notice as to fraudulent conveyances, and makes every one a fair purchaser who is not a participator in the fraud; so that a wife or father have only to remain wilfully ignorant of a husband's fraud, and a family settlement will be valid of property acquired by highway robbery. On the part of the plaintiff, it is submitted that the principle of law is to be found well expressed in the careful language of the sixth section of the statute of Elizabeth, that entire good faith, besides a valuable consideration, are indispensable to the validity of every marriage settlement.

Exception was also taken to three distinct errors alleged against the charge as follows:

First. The settlement covenants that the grantor should furnish the house in a suitable manner. As he proved insolvent and unable to comply with the other terms of the settlement, it was contended that five thousand dollars was a fraudulent investment in furniture, on which the jury were to pass their verdict. The court overruled this position, would not permit the jury to pass upon it, but assumed to itself the determination that there was no fraud. The case of Campion

[Magniac and others v. Thompson.]

v. Campion, 17 Ves. 262, the authority of which has been denied, sanctions this position of the plaintiffs' counsel, and is authority *a fortiori* when it determines against a family settlement.

Secondly. The settlement covenants that the grantor would in the space of a year place the sum of forty thousand dollars on good security and hand over the evidences thereof to the trustee; which covenant was never fulfilled. But several years afterwards, the trustee having in the meanwhile died without the acknowledgement or registry of the conveyance; the settlor, on the eve of the judgment he confessed to the plaintiff, passed over two promissory notes to the trustee's successor, in part performance of the settlement, as it was said. For the plaintiff it was contended that this was fraudulent, and as such to be passed upon by the jury. The court overruled this position; and erroneously, as is submitted, assumed to itself to determine that there was no fraud unless the settlor and the trustee concurred in it.

Thirdly. The deed of settlement was not recorded till after the plaintiffs' judgment; in which case the act of assembly of New Jersey is explicit that the conveyance is inoperative as against the judgment. Act of 5th June 1820, Laws of New Jersey, ed. 1821, page 747. Two cases have been determined in South Carolina, where the law is similar, that are strongly in point. Ward v. Wilson, 1 Dessaus. 401. Forrest v. Warrington, 2 Dessaus. 264. The statute of uses, 27 Elizabeth, ch. 10, annexes the possession to the use. The house and lot held by Mr Stockton in trust for his daughter became her property by the express terms of this statute: the husband by occupation reduced it into his possession; and the plaintiffs' judgment binds it notwithstanding the marriage settlement. The statute is positive that of real estate held for her use the seisin is in her. 4 Cruise, Dig. 96 (133); 419 (420), tit. xi. ch. 3, s. 4, 5, 6. The charge is that the marriage article is not a conveyance, but an executory covenant; which makes no difference, for the statute in terms comprehends that with all similar cases. It is the very case the statute intended to provide against.

[Magniac and others v. Thompson.]

Mr Binney, for the defendant in error.

There cannot be a better introduction to the defendant's argument, than a reference to Carver v. Jackson, 4 Peters, 80, upon the sweeping exceptions to the charge of the circuit court, which this bill of exceptions exhibits. The whole charge is set out, and the whole is excepted to, the recommendation of this court to the contrary notwithstanding; and the proper corrective of the practice if persisted in, would seem to be, to disregard every exception which any possible interpretation of the charge can obviate. A fair interpretation, as it is termed, does not belong to a practice which, whatever be its motive, is unjust to the court, the opposite counsel, and the cause. Nothing, however, is necessary to support this charge but the application of common rules.

What the plaintiffs' paper book calls the *overpowering* argument of the court upon the facts, is not a ground of exception. Whether the opinion of the court was right or wrong, it did not bind the jury. It may be difficult in some cases, and it was impossible in this, to say any thing about the facts, without an *overpowering* argument against the plaintiffs' claim. So far as that claim asserted any intentional wrong in any one of the parties to the settlement, it was wholly without foundation or colour. The naked question presented by the case, if question it was, was whether an antenuptial marriage settlement, a settlement in consideration of marriage, without the least suspicion by the intended wife or her trustee of either insolvency or debt on the part of the intended husband, was good against creditors. The facts exhibit nothing to vary the terms of this question. In the autumn of 1825 the defendant was worth from eighty to ninety thousand dollars, without any debt, and without any responsibility, except for a respondentia contract, which resulted in no loss. In September he made proposals of marriage and of settlement, and was accepted. On the 19th of December the articles in question were executed, after a statement of his property, set forth in the bill of exceptions. The marriage soon afterwards took place. The defendant then completed the house upon Mr Stockton's lot, at a cost of about twelve thousand dollars, and furnished it at a cost of about four thousand dollars, and in 1829 he handed to

the trustee five thousand dollars of good, and four thousand five hundred dollars of doubtful property, on account of the marriage settlement; and this is all that it has produced. The plaintiffs' demand, and the only demand in existence against the defendant, except a loan for personal expenses during his embarrassments, arose out of a contract in Canton, of the 22d November 1825. It was a loan of sixty-three thousand dollars, made upon a pledge of all the merchandize which that sum purchased in Canton, and twenty-three thousand dollars more, with the additional benefit of coming freight free to the United States, the intended market of the investment. The loan was made without the knowledge, and against the expectation of the defendant, but in virtue of a power left behind him to meet the contingency, which occurred, of his father's ships requiring funds to fill them up; and the commercial disasters of the season not only absorbed the entire pledge, but left the defendant a debtor to the extent of the judgment in the circuit court. The peculiar feature of this debt is therefore, that it is the *residuum* of a mortgage debt, after an original pledge of the entire investment of the money and a third more, and the specific transaction moreover unknown to the debtor at the time, and of course to the intended wife. What effect such a debt would have upon a *postnuptial* settlement, is a question that does not arise here. It would be a stronger case for such a settlement, than has ever been held to be insufficient.

The statute 13 Elizabeth does not avoid any settlement as *voluntary*, but only as *fraudulent*. *Actual* fraud in such a case could not be suggested upon the evidence; and if the law would *presume* it, it must do so in every imaginable case in which the settled property becomes necessary, by subsequent disaster, to pay the husband's previous debts. This proposition does not appear to be warranted by the books. The present is, however, an *antenuptial* settlement, upon the valuable consideration of marriage, the very highest consideration, as it is in one instance said, that is known to the law. 2 Eq. Ca. Abr. 585. It is valid against purchasers as well as creditors, purchasers even without notice, unless they have got the legal estate; for the wife is a purchaser, and has equal equity. Atherly, 129, 151; Roberts on Fraud. Con. 192, 193; Rev-

nell v. Peacock, 2 Roll. Rep. 105; Sir Ralph Bovy's case, 1 Ventr. 194; Douglass v. Ward, 1 Cases in Chan. 99; Ex parte Marsh, 1 Atk. 158; Brown v. Jones, 1 Atk. 190; North v. Ansell, 2 P. Wms. 618; Wheler v. Caryl, Ambl. 121; Brown v. Carter, 5 Ves. Jun. 878; Doe v. Routledge, Cowp. 712; Nairne v. Prowse, 6 Ves. Jun. 752; East India Company v. Clavel, 3 Bac. Abr. 315, *Fraud.*

Being such a consideration, the statute 13 Eliz. expressly excepts it from its operation. It excepts deeds upon valuable consideration, even fraudulently intended by the grantor to defeat his creditors, unless the grantee has notice or knowledge of such covin. The intended wife, and not merely her trustee, must have notice or knowledge that the bounty of the husband is intended as a fraud upon his creditors. Nothing short of this will answer. The fraud and the intended fraud, without such notice, are nothing more than in the case of an ordinary sale. Barrow v. Barrow, 2 Dick. 504; Champion v. Colton, 17 Ves. 263; Tunno v. Trevisant, 2 Desaus. 264; Preble v. Boghurst, 1 Swanst. 319.

The plaintiffs' counsel, while he impugned the doctrine in the circuit court, admits it here, and objects to the charge because it goes further. He understands the judge to have charged that something more is necessary than notice of the intended fraud; that there must be combination, concurrence, confederacy, preconcert. Supposing this not to have been explained or qualified, it means nothing more than what must exist in every such case as the plaintiff alleged this to be, one, namely, in which notice, if brought home at all, was so to a *party* with whom a previous negotiation was made for the deed, and who, in consummation of the treaty, accepted the deed. In such a case, all parties are actors in the fraud. The fraud is perpetrated with the aid of a party conscious of it, and assisting at its birth. If A. makes a fraudulent deed to B., C. may know of it, without combining or concurring; but if B. has notice of the fraud before, and at the time of accepting the deed, he is guilty of combination, concurrence, confederacy and preconcert with the grantor. There is unity of action and design in both. The statute, in such a case, punishes the

grantee by a penalty. This, consequently, was good law in reference to the case, as the plaintiff himself stated it.

But the court did not say that something *more than notice* was necessary. They simply stated what in every such case notice to the grantee must amount to. This meaning is obvious from many parts of the charge, and particularly from the concluding summary, in which the instruction is given to the jury. "A settlement made before marriage, makes the intended wife a purchaser. If agreed to be made, she is a creditor, and protected in the enjoyment of the thing settled, and entitled to the means of enforcing what is executory, if the transaction was bona fide, and without *notice of fraud*." The facts of fraud in the husband, and notice to the wife, were left to the jury. The doctrine of the court was, that both must be shown by the plaintiff; and if this is right, the main exception fails.

The main points adhered to in this court by the learned counsel, admit of short answers.

1. The paper book misstates the charge as to the furniture. The bill of exceptions must be the guide. It shows the plaintiffs' prayer to have been for an instruction that the expenditure of five thousand dollars in furnishing the house was per se, fraudulent, which the court refused. There is no such proposition in law, as that a covenant " to furnish a house *in a suitable manner*, as the husband shall judge fit and proper," which is the language of the covenant, or an actual expenditure to the extent of five thousand dollars, is per se fraudulent. There must be other circumstances. These were marriage articles, rather than a consummate settlement, and chancery will so mould and control them as to effectuate the intention, annulling the excess of the execution beyond what was lawfully intended. Atherley, 92, 106, 121. It is a strong proposition to assert, that an unsuitable expenditure by the husband, contrary to the express language of his covenant, shall defeat the wife's settlement for any thing more than the excess, when that is made out by evidence. The court expressed an opinion that the expenditure might be bad for the excess when shown, and were right in refusing to say that a given expenditure was, per se, a fraud.

[Magniac and others v. Thompson.]

2. The delivery of notes to the trustee, upon the eve of the plaintiffs' judgment, was good, if the settlement was so. The trustee was a creditor to a much larger amount, and the debtor had a right to prefer him. The court were right in saying that the payment or delivery was good, unless made by the defendant with the intention of covering the property under pretence of the articles, and so accepted by the trustee.

3. The New Jersey statute of 5th June 1820, is wholly misconceived, or rather its effect. If the deed is void by reason of the non-registry, the real estate, upon which alone the statute has any bearing, remains the property of R. Stockton, and is liable to his creditors. The creditors of the grantor, and not the grantee, are the creditors meant by the statute. It is difficult to sustain the exception, that the judgment against Thompson is to prevail over the settlement and defeat it, when it is only by the validity of the settlement that Thompson can have any thing in the land for the judgment to affect. It is a further mistake to suppose that any use in the real estate, in the settlement, was executed by the statute in the defendant. The legal estate was intended to remain in R. Stockton, for the performance of the trusts. They could not be performed witnout it. He was in certain events to lease, to receive the rents, to convey. The execution of a use in the defendant, would have been contrary to the whole scope of the articles, and therefore it is not executed. 1 Saunders on Uses, 246, 206, 208, and the authorities there cited; 1 Shep. Touch. 505.

But if executed in the defendant as to the legal estate, it could not have altered the case, as he would have thereby become a trustee for the purposes of the settlement; and, consequently, for the separate use of his wife and her children.

Mr Justice Story delivered the opinion of the Court.

This is a writ of error to the circuit court for the district of Pennsylvania. The original action was a feigned issue between the plaintiffs, who are creditors, and the defendant, to try the question, whether he is able to pay the debt due to them; and this depends upon the validity of certain articles of settlement, made in contemplation of a marriage between the defendant and Miss Annis Stockton, daughter of the late Rich-

ard Stockton, Esq. stated in the case. The verdict in the court below was for the defendant; and judgment having been rendered thereon accordingly, the present writ of error is brought to revise that judgment, upon a bill of exceptions taken to the charge of the court at the trial.

The whole charge of the court is spread upon the record (a practice which this court have uniformly discountenanced, and which, we trust, a rule made at the last term will effectually suppress); and the question now is, whether that charge contains any erroneous statement of the law; for as to the comments of the court upon the evidence, it is almost unnecessary to say, after what was said by this court in Carver v. Jackson, 4 Peters's Reports, 80, 81, that we have nothing to do with them. In examining the charge for the purpose of ascertaining its correctness in point of law, the whole scope and bearing of it must be taken together. It is wholly inadmissible to take up single and detached passages, and to decide upon them without attending to the context, or without incorporating such qualifications and explanations as naturally flow from the language of other parts of the charge. In short, we are to construe the whole as it must have been understood, both by the court and the jury, at the time when it was delivered.

The material facts are as follows: The plaintiffs and the defendant were resident merchants in China; and the defendant left it in March 1825 to visit America. In the summer of that year he paid his addresses to Miss Stockton, then resident with her father in New Jersey, by whom his addresses were accepted; and in contemplation of marriage on the 19th of December of the same year the articles of marriage settlement referred to were executed. They purport to be articles of agreement and covenant between the defendant of the first part, Miss Annis Stockton of the second part, and Richard Stockton, father and trustee of Miss Stockton, of the third part. By these articles, after reciting the intended marriage, and that Richard Stockton, the father, had promised to give a certain lot of land (described in the articles) to his daughter, upon which the defendant, Thompson, had begun to build a house, it is stated that R. Stockton covenants, in consideration of the

said marriage, and his love and affection for his daughter, that from the time of the marriage he will stand seised of the lot and premises in trust to permit the defendant and Annis his wife to live in and occupy the same; and if they do not think proper so to do, then to let out the premises on lease, and receive the rents and profits and pay over the same to the said Annis during the joint lives of herself and her husband (the defendant); if the defendant should survive his said wife and have issue by her, then in trust to permit him during his life to inhabit and occupy the premises, if he should elect so to do, and to pay over the rents and profits to him for the support of himself and his family, without his (the defendant's) being accountable therefor; and after his death, in trust for the child or children of the marriage in equal shares as tenants in common; and if no children, then upon the death of either the husband or the wife, to convey the premises to the survivor in fee simple. By the same instrument the defendant covenants, that if the marriage should take effect, and in consideration thereof, he will, with all convenient speed, build and furnish the house in a suitable manner, as he shall judge fit and proper, and that the erections, improvements and furniture shall be subject to and included in the trusts. And further, that he will, in the space of a year from the marriage, place out at good security, in stock or otherwise, the sum of forty thousand dollars, and hand over and assign the evidences thereof to the trustee, who shall hold the same in trust to receive the interest, profits and dividends thereof for the wife, during the joint lives of herself and her husband. And if she should die before her husband, and there should be issue of the marriage, then in trust to receive the interest, profits and dividends, and pay the same to the husband during his life, for the support and maintenance of himself and children, without any account, and after his death, in trust for the children of the marriage. A similar provision is made in case of the survivorship of the wife; and if no children, then the trustee is to assign and deliver the securities and moneys remaining due to the survivor, to his or her own use.

Such are the most material clauses of the marriage articles. Before the execution of them, the defendant made out a writ-

ten statement of his pecuniary circumstances, in which he states that he owes no personal debts except to a small amount, in the common course of business; that he is surety for his father in a bottomry bond to Messrs Schott and Lippincott, in the penal sum of two hundred thousand dollars, upon which there was a pledge of goods, supposed to be sufficient to discharge the bond; and if any loss should accrue, it could not be more than twenty thousand dollars, and that he considered himself worth that amount, if not more, in addition to the sum proposed to be settled.

From the testimony in the case, which is stated in the charge, it appears that the marriage was consummated; that the defendant built the house on the lot mentioned in the articles at an expense of thirteen thousand dollars, and furnished it at the expense of five thousand dollars, but invested no part of the forty thousand dollars during the life of the trustee. It also appears, that at the time of executing the articles, he was worth about eighty or ninety thousand dollars in money and personal property; that his agent in China, in November and December 1825, borrowed of the plaintiffs sixty-three thousand dollars on the pledge and security of property of the invoice value of eighty-six thousand dollars and upwards, on the credit of the defendant, but entirely for the use of the defendant's father, in order to complete the cargoes of his ships, then at Canton short of funds. The property arrived at a losing market, and the debt now due to the plaintiffs by the defendant, grew out of their transactions, his father having failed on the 19th of November 1825; but the existence of the loan contracted with the plaintiffs, was not known to the defendant (though fully authorized to be made, if necessary) until the spring of 1826.

The marriage articles were never recorded in New Jersey, where the land lies, until May 1830, after the death of the trustee. In September 1829, shortly before the plaintiffs obtained a judgment for either debt against the defendant, the defendant delivered over to captain Robert Stockton, the son of the trustee, who succeeded him in the trust, securities to the amount of nine thousand five hundred dollars on account of the sum to be invested pursuant to the marriage articles.

[Magniàc and others v. Thompson.]

Such are the material facts which appeared at the trial; and the question was, whether, under all the circumstances, the marriage articles were void as a fraud upon creditors. With reference to this point, the learned judge who delivered the charge to the jury, made, among others, the following remarks. " To taint a transaction with fraud, both parties must concur in the illegal design. It is not enough to prove fraud in the debtor. He may lawfully sell his property, with the direct intention of defrauding his creditors, or prefer one creditor to another. But, unless the purchaser or preferred creditor receives the property with the same fraudulent design, the contract is valid against other creditors or purchasers, who may be injured by the transaction." " Before you can pronounce this marriage agreement void and inoperative on the ground of actual fraud, you must be satisfied, not only that the defendant made it with design to defraud his creditors, but also that Mrs Thompson, and her father and trustee, Mr Richard Stockton, participated and concurred in the fraud intended. If they were innocent of the combination, it would be harsh and cruel in the extreme to visit on her the serious consequences of her intended husband's acts, and as inconsistent with law as justice." " The deeds, gifts, grants or other contracts, which the law avoids, are those made with intent to defraud, hinder, delay or injure creditors; and in order to avoid them, both the party giving and the party receiving must participate in the fraud." " The words of the law (the statute of 13 Elizabeth, ch. 5), require that both parties must concur in the fraud in order to bring the same within the provisions."

Nothing can be clearer, both upon principle and authority, than the doctrine, that to make an antenuptial settlement void, as a fraud upon creditors, it is necessary that both parties should concur in, or have cognizance of the intended fraud. If the settler alone intend a fraud, and the other party have no notice of it, but is innocent of it, she is not, and cannot be affected by it. Marriage, in contemplation of the law, is not only a valuable consideration to support such a settlement, but is a consideration of the highest value; and from motives of the soundest policy is upheld with a steady resolution. The

husband and wife, parties to such a contract, are therefore deemed in the highest sense purchasers for a valuable consideration; and so that it is bona fide, and without notice of fraud, brought home to both sides, it becomes unimpeachable by creditors. Fraud may be imputable to the parties, either by direct co-operation in the original design at the time of its concoction, or by constructive co-operation from notice of it, and carrying the design, after such notice, into execution.

The argument at the bar admits these principles to be incontrovertible. But it is supposed by the counsel for the plaintiffs in error, that the charge contains a different and broader doctrine; that it requires active co-operation, pre-concert and participation in the original design of fraud; and that notice of it is not sufficient to avoid the settlement, although all the parties, after such notice, proceed to execute it.

It appears to us that this is an entirely erroneous view of the scope and reasoning of the charge, even in the passages above cited. But taking them in connexion with other passages in the same charge, it is beyond doubt that no such distinction was in the mind of the court, or was in fact uttered to the jury. The language of the charge has reference to the actual posture of the case before the court, and not to any other possible state of facts. The case was not of a settlement already made and executed by the settler alone, with a fraudulent intent, to which settlement the wife or her trustee were not contemplated to be executing parties, and which was, after notice of the intent, accepted by them; in which the effect of notice might have been the very hinge of the cause. But the case was of marriage articles about to be executed by all the parties upon negotiations then had between them for that purpose; and of course, if there was a fraudulent design, known to all the parties at the time, the very execution of the articles made them all equally participators, and parties to the fraud. It necessarily involved combination, and participation, and pre-concert. It was to this posture of facts that the reasoning of the charge was addressed; and it met and stated the law truly, as applicable to them. Notice under such circumstances, necessarily included participation in the fraud. It was not possible that the wife and her trustee, with notice of an intended fraud on

the part of her husband, could execute the instrument without being, in the sense of the law, participes delicti.

But the charge does, in various other passages, distinctly point out to the jury the very doctrine which the plaintiffs in error assume as the basis of their argument, and for which they contend. Thus, in commenting upon the different classes of conveyances, to which the statute of 13 Elizabeth is applicable, it is observed, that all conveyances are valid and excepted, which are " for a valuable consideration, in good faith, without notice by the person receiving the conveyance of any fraud, covin or collusion by the grantor to defraud his creditors." Again " the consideration being valuable, if the contract, whether executed or executory, is made in good faith, with one having no notice or knowledge of any fraud, covin or collusion to defraud creditors, performance may be enforced or voluntarily made, and the contract carried into execution at any time, either in the whole or in part, as is in the power of the party." Again, "it is the opinion of the court, that the evidence in this case brings the marriage contract within the sixth section of the law (the act of 13 Elizabeth), excepting it from the operation of the first section; unless you shall find that it was made, not bona fide, or with notice or knowledge of a fraud in John R. Thompson in entering into it, brought home to his intended wife, and that Thompson actually entered into it with such fraudulent, covinous and collusive intention." And, without dwelling on other passages equally expressive, it is added in the very close of the charge, " we conclude, then, with instructing you, that a settlement made before marriage, makes the intended wife a purchaser for a valuable consideration; if agreed to be made, she is a creditor, and protected in the enjoyment of the thing settled, and entitled to the means of enforcing what is executory, if the transaction was bona fide and without notice or fraud." That these directions are correct in point of law, cannot admit of doubt; and that they cover the whole ground asserted in the argument for the plaintiffs, seems equally undeniable. We may then dismiss any further commentary on this part of the case.

The next objection is, to the charge of the court in regard to the furniture. The court were requested to charge the jury

that the expenditure of five thousand dollars in furnishing the house was, per se, fraudulent. The court refused so to do, stating, " that furniture is part of the marriage contract, to be provided by Thompson, in a suitable manner, as he should think fit. He had a discretion which he might exercise in a reasonable manner, according to their station and associations in life; proportioned to the kind of house and extent of income; the trustee or wife could not, in law or equity, compel Thompson to furnish it extravagantly, or at useless and wanton expense; and if he should do it voluntarily, it would not be within the true spirit and meaning of the marriage articles, and might be deemed a legal fraud on creditors as to the excess. But before we can say that it is a fraud in law to expend five thousand dollars in furnishing a house costing thirteen thousand dollars, and the establishment to be supported by the income of an investment of forty thousand dollars in productive funds; we must be satisfied that it is, at the first blush, an extravagant and unwarranted expenditure under all the circumstances in evidence, and to an extent indicating some fraudulent or other motive unconnected with the fair execution of the contract, of which we are not satisfied."

It is difficult to perceive any error in this direction; and it was going quite as far in favour of the plaintiffs in error as the law would warrant; for the change of circumstances of the defendant made no difference in his obligations to perform the stipulations of the marriage articles. The court might well have refused to give the instruction without any explanation, for it was asking them to decide, as matter of law, what was clearly matter of fact. The argument at the bar has indeed insisted that the court misunderstood the object and request of the counsel; but there is no evidence of that on the record, and certainly it is not to be presumed.

The next objection is to the charge of the court respecting the delivery of the notes to Captain Robert Stockton, in September 1829. The court were requested to charge the jury, that the delivery of these notes to Captain Stockton was a fraud. The court directed the jury that "if it was done in order to comply, in part, with the agreement, it was not so. If it was colourable, made with the intention of covering and conceal-

[Magniac and others v. Thompson.]

ing so much, under pretence of the marriage articles, for Thompson's use, and so received by the trustee, it was legally fraudulent as to creditors; but if delivered with such intention, and not so accepted, then Captain Stockton might not only fairly apply it to the trust fund, but was bound so to do. Though it may have been done on the eve of the judgment confessed in New Jersey, that would make no difference.; it being to carry into effect the agreement of December 1825."

We cannot perceive any error in this part of the charge. The wife became a purchaser and creditor of her husband, in virtue of the marriage articles ; and if the delivery of the notes was made in part performance of these articles, bona fide, and without fraud, it was a discharge of a moral as well as of a legal duty. Among creditors equally meritorious, a debtor may conscientiously prefer one to another; and it can make no difference that the preferred creditor is his wife.

The remaining objection is, that the marriage articles are inoperative and void, not having been recorded within the time prescribed by the laws of New Jersey for the registration of conveyances. To this objection several answers may be given, each of which is equally conclusive against the plaintiffs in error. In the first place, marriage articles or settlements, as such, are not required by the laws of New Jersey to be recorded at all, but only conveyances of real estate; and as to conveyances of real estate, the omission to record them, avoids them only as to purchasers and creditors, leaving them in full force between the parties. This is the express provision of the statute of New Jersey of 1820(a): so that, notwithstanding the non-registration, the articles were good between the parties. In the next place, as to the personal estate, covenanted on the part of the defendant to be settled on his wife, whether furniture or money, it is clear that the non-registration of the articles could produce no effect whatever. If the conveyance was free of fraud, it was as to the personal estate completely valid, even against creditors. In the next place, as to the real estate covered by the articles, whether these articles are treated as an actual conveyance, or as an executory contract, it is clear, that

(a) See the act of 1820. Laws of New Jersey, edition of 1821, p. 747.

except as to the creditors of the grantor, Mr Stockton, they were completely valid, and operative. Viewed as a conveyance, or as a contract for a conveyance, the husband could not, consistently with the avowed trusts, take any legal estate or executed use in the real estate. The grantor necessarily remained the legal owner, in order to effectuate the trusts of the settlement; and the husband could entitle himself to the benefit of the trusts provided in his favour, only in the events and upon the contingencies which are therein stated. He had no equitable interest therein capable of a present appropriation by his creditors. In every view of the circumstances, it is therefore clear, that the non-registration of the articles does not touch the plaintiffs' rights; and the court were correct in their instruction to the jury, " that the marriage contract is not void for want of being recorded in time."

Upon the whole, it is the unanimous opinion of the court that the judgment of the circuit court ought to be affirmed, with costs.

Judgment accordingly.