BELSEA et al. v. TINDALL et al.

(Circuit Court of Appeals, Ninth Circuit.   September 5, 1911.)

No. 1,849

**1. TRIAL (§ 296*)—INSTRUCTIONS—BURDEN OF PROOF.**

Where defendants, in addition to a denial of material allegations of the complaint, pleaded an estoppel, it was not error for the court to charge generally that the burden of proof rested on plaintiffs, and that, to entitle them to recover, they must establish every material allegation of the complaint by a preponderance of the evidence, where further along in the charge the jury were told that the burden rested on defendants to prove by a preponderance of the evidence the affirmative matter pleaded.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 705–713;  Dec. Dig. § 296.*]

**2. MINES AND MINERALS (§ 68*)—LEASES.**

In an action of ejectment by the owners of a placer mining claim against the lessees, evidence that, after the commencement of the action, defendants continued to work the claim for more than a year, from time to time washing the gold from the dumps of gravel hoisted therefrom, and that plaintiffs visited and inspected the workings during such time, and received and receipted for the share of the gold reserved by the lease as royalty without objection, was sufficient to warrant the submission to the jury of the defense of estoppel pleaded by defendants to a claim for damages for such working set up in an amended complaint.

[Ed. Note.—For other cases, see Mines and Minerals. Dec. Dig. § 68.*]

**3. MINES AND MINERALS (§ 68*)—LEASE—BREACH.**

The question whether lessees of a placer mining claim worked it "mine-fashion" as required by the lease *held* properly submitted to the jury under the evidence in an action of ejectment by the lessors, based on an alleged failure to do the work in accordance with the terms of the lease.

[Ed. Note.—For other cases, see Mines and Minerals. Dec. Dig. § 68.*]

**4. MINES AND MINERALS (§ 68*)—MINING LEASE—CONSTRUCTION—"PAY DIRT."**

The term "pay dirt," as used in a placer mining lease, requiring the lessees to remove all "pay dirt as low as 2 cents per pan," *held* properly construed by the court in the light of all the surrounding circumstances and conditions pertaining to the working of the claim as not meaning all dirt in the mine averaging two cents per pan, but all such that it would pay to mine by the use of minerlike methods.

[Ed. Note.—For other cases, see Mines and Minerals, Dec. Dig. § 68.*]

In Error to the District Court of the United States for the Fourth Division of the Territory of Alaska.

Action at law by John Belsea and W. P. Beardsley against Edward Tindall and William C. Finn.   Judgment for defendants, and plaintiffs bring error.   Affirmed.

Action in ejectment to recover possession of a placer mining claim described as claim No. 2, above discovery on Ester creek, in the Fairbanks mining district, territory of Alaska, and for damages for the alleged wrongful withholding of such possession.

On July 7, 1906, the plaintiffs in error, John Belsea and W. P. Beardsley, who were then doing business in Alaska under the firm name and style of the Eagle Mining Company, leased to C. G. Finger and Edward Tindall the placer mining claim described as mining claim No. 2, above discovery on Ester

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

creek, in the Fairbanks mining district in Alaska. The lease was for a term of a little more than three years, terminating at noon on the 1st day of September, 1909, unless sooner forfeited or determined by the violation of any of the covenants of the lease by the lessees.

The covenants of the lease material to the present controversy were, on the part of the lessees:

"(1) To enter upon said above-described mining property at once, to work the same mine-fashion starting and lower line working same with a straight face at least 100 ft. wide or more if required to get all pay dirt as low as 2 cts. per pan, in other words, to good and economical mining so as to take out the greatest amount of mineral with due regard to the development and preservation of the same as a workable mine and to the special covenants hereinafter reserved. * * *

"(3) To allow said parties of the first part or their agent from time to time to enter upon and into all parts of said mining premises for purposes of inspection. * * *

"(5) No clean-ups to be made without party or parties of the first part or their agent being personally present. All gold dust to be well cleaned.

"(6) To pay as royalty to the said parties of the first part, forty per cent. (40%) of all gold and other precious mineral taken from said ground such payments to be evidenced by receipts at the office of the Eagle Mining Co. on claim No. 3, above Ester creek, Fairbanks mining district, district of Alaska. * * *

"(8) * * * That upon violation of any covenant or covenant or covenants hereinbefore reserved the term of this lease shall at the option of the parties of the first part expire and the same and said premises with the appurtenances shall become forfeited to said parties of the first part and said parties of the first part or their agent may thereupon after demand of possession in writing enter upon said premises and dispossess all persons occupying the same with or without process of law or at the option of said parties of the first part said parties of the second part and all persons found in occupation may be proceeded against as guilty of unlawful detainer."

In the summer of 1907 (the exact date is not stated) this lease was extended by the lessors one year, or until September 1, 1910. After this extension and after September 14, 1907, Finger sold all his interest in the lease to William C. Finn. Thereafter Edward Tindall and William C. Finn, the defendants in error, were the owners of the entire leasehold estate in the claim. On February 19, 1908, Beardsley and Belsea notified Tindall, Finn, and Finger of a forfeiture of the lease on the ground that the defendants had failed to work the claim in accordance with the terms of the lease. On February 24, 1908, Beardsley and Belsea commenced the present suit in ejectment against Tindall, Finn, and Finger for the recovery of the possession of the claim.

In the second amended and supplemental complaint filed October 8, 1909, it is charged that after the execution of the lease, and prior to the commencement of the action, the defendants had violated its conditions and covenants by failing and refusing to work the premises in mine fashion; that commencing from the lower line of the claim the defendants did not work the same with a straight face at least 100 feet wide; that they left pay dirt on each side of the portion of the ground mined by them of the value of more than two cents to the pan for an average thickness of not less than the thickness of the pay streak; that they left a portion of the pay streak unmined for the entire width of the same; that they did not carry on said mining in a good or minerlike manner; that they did not take out the largest amount of mineral with due or any regard to the development of the same as a workable mine; that they left a large pillar of pay dirt of the value of more than two cents to the pan running across the entire pay streak, of an average thickness up and down stream of not less than about 30 feet: that they left good and valuable pay dirt of a value of more than two cents to the pan on each side of that portion mined by them, although requested and required by plaintiffs to take out and mine all of said pay

dirt; and that said defendants and each of them, although required so to do by plaintiffs, refused to work up the claim with a straight face, and with a face not less than 100 feet in width, and as much wider as would be necessary to take out all pay dirt having a value of two cents to the pan, contrary to the express provisions of the lease, and contrary to the working of said mine in a good, minerlike fashion; that between the dates mentioned, and especially between the 1st day of October, 1907, and February 19, 1908, defendants had failed, neglected, and refused to work and mine the said property in an economical and minerlike way, and had failed, neglected, and refused to mine and work said mine with a straight face of a width of 100 feet, and had failed, neglected, and refused to mine and take out large portions of the pay dirt of a value of more than two cents to the pan, but had wrongfully and willfully worked and mined the property in a wasteful, extravagant, and destructive manner, gouging out the richest part of the pay streak, and butchering the claim in such manner that a large portion of the gold therein would be and was wasted and lost to the plaintiffs. It is alleged that plaintiffs dissolved their partnership on February 9, 1908, and thereupon Belsea conveyed to Beardsley the upper 75 feet of the claim, and Beardsley assigned to Belsea all of his right, title, and interest in the claim for damages against the defendants, and that Belsea had become the owner of such claim for damages. It is alleged that on February 19, 1908, plaintiffs declared a forfeiture of the lease, and that defendants Tindall and Finn were notified of such declaration.

A second cause of action is alleged in which it is charged, substantially as in the first cause of action, that since the commencement of the action and the service of summons defendants have continued to carry on mining operations upon said claim contrary to the rights of the plaintiffs; that since the commencement of the action such mining operations on the part of the defendants Tindall and Finn have been in violation of the terms of the lease; that large quantities of pay dirt or gravel had been left behind unmined; that on May 15, 1909, the defendants ceased mining said ground in the underground workings thereof, and thereupon turned large quantities of water into the underground workings of said claim, thus preventing said plaintiffs or either of them from entering the underground workings of said claim, and testing the value of the ground left by the defendants, and thereby preventing the plaintiffs from proving the damages sustained by them. Belsea demands judgment for the possession of the claim, except the upper 75 feet. Beardsley demands judgment for the possession of the latter portion of the mine. Belsea also demands judgment for damages in the sum of $1,000 for the withholding of the premises prior to the commencement of the action, and for $24,000 for the withholding of the premises since the commencement of the action.

To this complaint the defendants Tindall and Finn filed their answer on October 12, 1909, admitting the ownership of the claim by the plaintiffs and its lease to the defendants as alleged in the complaint, but denied the allegations of the complaint charging that the defendants had not worked the claim in accordance with the terms of the lease, and for an affirmative defense the answer alleged, in substance, that the defendants Tindall and Finn were the owners of the leasehold estate, and were in actual possession of the property and mining thereon with a large and expensive plant of machinery, and with a large force of men, and were then and had been at all times continuously actually engaged in mining the same in compliance with the terms of the lease, except when restrained therefrom by the order of the court made in the case on May 22, 1909; that on that date an order of injunction was made and signed by the court restraining the defendants and their employés from mining said ground pending the action, and that ever since that date the defendants have been restrained and enjoined from working and mining thereon; that, as soon as the court will permit, the defendants would immediately and in good faith continue to prospect and search for pay and gold-bearing gravels therein, and would dig, work, mine, hoist, and pile the said pay and gold-bearing gravels on the surface of the ground, and especially would and had at all times intended to dig, excavate, and hoist, pile, and clean up the partition or pillar between

the first old works or block No. 1 on the lower end of the claim and the next block above, and all other ground then unmined and so complained of by the plaintiff Belsea.

The defendants alleged that it was their intent and purpose, and they had the financial ability, to work said claim continuously until all the pay dirt therein of the value of two cents in the pan was worked out, and this they could do before the expiration of the lease on September 1, 1910. The defendants alleged the particulars concerning the working of the mine, the presence of the plaintiff Belsea, and his attorney in fact and agent, W. C. Harp, during defendants' mining operations, the acceptance by the plaintiff of his royalty of 40 per cent. Upon the proceeds of such continued operations, the fact that plaintiffs stood by in silence and without objection during the winter of 1908–1909, and saw the defendants work and mine the ground and excavate from the underground workings thereof gold-bearing gravel, and deposit and pile up this gravel on the surface in two large and valuable dumps ready for washing and cleaning up, and the separation of the gold therefrom; that these two dumps contained on April 27, 1909, gold of the value of $100,000; that immediately after May 8, 1909, defendants began to sluice and wash up the same, and between the first day of sluicing and the 22d day of May the defendants washed up and cleaned out of these two dumps then on the surface of the claim gold and gold dust of the value of $39,445, and on the 13th, 16th, 19th, and 21st days of May, 1909, defendants paid to the plaintiff Belsea 40 per cent. of the gross amount thereof under the terms of the lease, to wit, the sum of $15,776.20; that said payments were in full and so received by Belsea; that thereafter and at the time of filing the answer on October 12, 1909, the remainder of the two dumps on the surface contained more than $50,000 in gold: that the defendants were the owners and entitled under the lease to 60 per cent. of that amount, or $30,000, which defendants alleged that plaintiff was seeking to convert to his own use.

Plaintiffs' reply denied in the main the affirmative matter alleged in defendants' answer. Plaintiffs' two causes of action were: First, a violation of the terms of the lease on the part of the defendants by reason of their alleged failure to work the ground in the manner provided for in the lease, and upon which alleged failure a notice of forfeiture was served upon the defendants on February 19, 1908. For this cause of action, plaintiffs demanded judgment for the possession of the property and damages for the wrongful withholding of the same in the sum of $1,000. The second amended and supplemental complaint filed on October 8, 1909, alleged an additional or second cause of action, upon which plaintiffs demanded judgment for $24,000 in damages for the wrongful withholding of the premises and for a continuing violation of the terms of the lease after notice of forfeiture and after the commencement of the action.

It appears from the evidence that the claim in question is a placer claim about 1,000 feet in length, extending along Ester creek. The width of the claim is about 900 feet. The bedrock under the claim is from 30 to 40 feet beneath the surface. On this bedrock is a deposit of gravel containing gold, extending lengthwise of the claim. The width of the deposit varies from 100 to 200 feet. Along its center or channel it is from 3¼ to 4 feet deep, but the depth gradually diminished in the direction of the sides until the gravel ceases altogether. To reach this gravel deposit the defendants sunk shafts from the surface to the bedrock, a distance, as before stated, of from 30 to 40 feet. The shafts were sunk to a convenient point on the bedrock for the convenient and economical removal of the gravel. This appears to have been somewhere near the center of the deposit crosswise. From the bottom of the shaft the defendants ran tunnels across the deposit through which the pay gravel was removed to the shaft and hoisted to the surface and placed in dumps for washing at the appropriate season. Not all the gravel was pay gravel. Generally the gold in the gravel diminished in value in the direction of the sides. It was accordingly provided in the lease that the "pay dirt" to be removed by the defendants was to pay at least two cents per pan. If the pay was below that amount, the defendants were not required to remove the gravel.

The defendants in this case sunk eight different shafts to the bedrock at convenient points along the length of the claim, and through these shafts hoisted the "pay dirt" or gravel to the surface. The ground worked through a shaft was designated as a block, with a number corresponding to the number of the shaft through which the block was worked. It appears that between blocks 1 and 2 the defendants did not remove all the pay gravel, but left a section extending across the block which they claim they left as a bulkhead to keep out the water of Ester creek, but which they proposed to remove before they left the mine. The plaintiffs claim that under the terms of the lease this deposit should have been removed while the work in that locality was in progress. This was the commencement of the controversy between the parties. It is claimed, further, by the plaintiffs that the defendants in working the mine left quantities of pay gravel around the shafts. These deposits were designated as pillars in the testimony. It is also claimed by the plaintiffs that the defendants left pay gravel on the sides, and that the leaving of these various deposits was a violation of the terms of the lease. The defendants claim that they would have worked out all the pay gravel in the mine during the term of their lease had they not been prevented by the injunction obtained by plaintiffs. The case was tried before a court and jury, and resulted in a verdict in favor of the defendants. From the judgment entered on this verdict, the case is brought here by the plaintiffs on a writ of error.

Stevens, Roth & Dignan, Campbell, Metson, Drew, Oatman & Mackenzie, and E. H. Ryan, for plaintiffs in error.

James Wickersham, for defendants in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above). The question in the court below was whether the defendants had worked the claim in accordance with the terms of the lease. The lease provided certain specific directions for working the claim, and the question was whether these directions had been followed by the lessees. The lease required that the lessees should "work the claim mine fashion, starting and lower line working the same with a straight face, at least one hundred feet wide, or more if required, to get all pay dirt as low as two cents per pan." To make these instructions more certain and definite the lease stated them. "In other words," that is to say, the lessees were required "to good and economical mining so far as to take out the greatest amount of mineral with due regard to the development and preservation of the same as a workable mine."

[1] Whether the defendants worked the mine in accordance with these directions the evidence was conflicting. It was therefore a question of fact for the jury to determine upon the weight of evidence under appropriate instructions by the court. The errors assigned relate to these instructions. The court instructed the jury fully as to the issues involved in the case as set forth in the plaintiffs' complaint, the defendants' answer, and plaintiffs' reply, and in an orderly way gave the usual instruction that the burden of proof was upon the plaintiffs, and that it was incumbent upon them to establish all the material allegations of their complaint by the weight or preponderance of the evidence. The jury were instructed that, unless they found and believed from all the evidence in the case that the plaintiffs had sustained the material allegations of their complaint by the weight or preponderance of the evidence, it could not find in plaintiffs' favor,

and the verdict should be for the defendants; and if the jury should find and believe from the evidence that the evidence did not preponderate in favor of either of the parties, but was equally balanced, then it should find for the defendants.

It is objected to this instruction that it leaves out of consideration entirely the question of estoppel, affirmatively pleaded by the defendants, and upon which defendants relied, and the burden of proof of which was upon the defendants. The objection cannot be sustained for the reason that in the instruction complained of the court was referring to the evidence required to sustain plaintiffs' complaint. When the court reached an appropriate place in its instructions in referring to the defendants' affirmative defense, the court gave the required instruction, and gave it in a way so as to avoid confusion and mistake as to its proper relation to the issue involved. The court in this part of its instruction again referred to the fact that the burden of proof in the case as in all civil cases was upon the plaintiffs; that the plaintiffs must establish all the material allegations of their complaint by a fair preponderance of the evidence. "But," said the court, "when that is once done to your satisfaction, in order for the defendants to overcome the right of the plaintiffs to prevail by reason of any affirmative defensive matter set up in their answer, it then becomes necessary for the defendants to prove such affirmative matters by the weight or preponderance of the evidence." To this instruction there was no objection, as, indeed, there could be none. It is a clear statement of the rule relating to evidence given in support of an affirmative defense, and its omission from that part of the instruction relating to the plaintiffs' case as set forth in their complaint was not error. "In examining the charge for the purpose of ascertaining its correctness in point of law, the whole scope and bearing of it must be taken together. It is wholly inadmissible to take up single and detached passages, and to decide upon them, without attending to the context, or without incorporating such qualifications and explanations as naturally flow from the language of other parts of the charge. In short, we are to construe the whole, as it must have been understood, both by the court and the jury, at the time when it was delivered." Magniac v. Thomson, 7 Pet. 348, 389, 8 L. Ed. 709; Evanston v. Gunn, 90 U. S. 660, 666, 668, 25 L. Ed. 306.

[2] The court instructed the jury that the defendants were held by law to a substantial compliance with all the terms and conditions of the lease, and, if the jury found by a preponderance of the evidence that it failed to comply substantially with any of the terms of the lease, plaintiffs would be entitled to recover the possession of the premises in controversy. To this instruction there was appended this qualification:

"Unless you further find that the plaintiffs have estopped themselves from claiming the possession of said premises by their own acts, as you will be hereafter instructed."

It is objected to this last part of the instruction, as well as to the instructions relating to estoppel thereafter given, that there was no evidence sufficient in law on which to base an instruction on the sub-

ject of estoppel, and which would give the jury the right to pass upon that issue in favor of the defendants. This objection is urged against all the instructions referring to the defense of estoppel as set up by the defendants. It is not based upon the objection that the law was incorrectly stated, but that the evidence was not sufficient to create an estoppel. If there was any evidence tending to establish the defense of estoppel, the question was for the jury. If there was no evidence in support of that defense, the objection should have been made by requesting the court to so instruct the jury and directing a finding on that issue in favor of the plaintiffs. This the court was not requested to do.

Was there any evidence tending to establish the defense of estoppel, and, if there was such evidence, did it relate to the first cause of action or to the second cause of action, or to both? The court instructed the jury that the defense of estoppel could not overcome the effect of the bringing or the maintenance of the suit by the plaintiffs; that is to say, if the jury found by a preponderance of the evidence that the defendants had violated the terms of their said lease prior to the 19th day of February, 1908, and prior to the service of the written notice of forfeiture upon them, that no conduct of the plaintiffs or their agents subsequent to the service of the summons could in any event estop the plaintiffs from bringing an action and recovering the possession of the premises for such a breach, and no act or word of the plaintiffs after the service of the summons in the case could estop them from proving the breach occurring, if the jury found from a preponderance of the evidence that such did occur, prior to the commencement of the action and service of summons upon them. In other words, the defense of estoppel to be effective against acts of forfeiture alleged in the complaint must be supported by evidence of conduct on the part of the plaintiffs or their agents occurring prior to the notice of forfeiture and the service of summons in the case.

It is admitted by the plaintiffs that this instruction was correct as applied to any alleged acts of defendants occurring subsequent to the commencement of the action, but it is contended that the defendants did not allege or attempt to prove estoppel by acts prior to the commencement of the action. Conceding this to be the fact, it follows that the evidence tending to establish the defense of estoppel was limited to the second cause of action, wherein there was a claim for damages in the sum of $24,000 for continuing acts in violation of the terms of the lease after notice of forfeiture and after the commencement of the action. What was this evidence? The lease was entered into on July 6, 1906, and immediately thereafter the lessees entered into the possession of the property. On February 19, 1908, the complainants notified the defendants that the forfeiture of the lease was claimed, and on February 24, 1908, the original suit in ejectment was filed in this case. But nothing appears to have been done under this original complaint. On May 1, 1908, defendants cleaned up from the workings of the claim gold dust amounting in value to $69,136, and thereupon defendants paid to the plaintiffs the 40 per cent. royalty to which they were entitled under the lease, namely, $27,554, the defendants

retaining the remaining 60 per cent., amounting to $41,582. In October, 1908, defendants cleaned up from the workings of the claim gold dust amounting in value to $24,019.20, and thereupon paid plaintiffs the 40 per cent. to which they were entitled, amounting to the sum of $9,607.68, the defendants retaining the balance. On May 22, 1909, defendants cleaned up gold dust amounting in value to $39,445, and thereupon paid to the plaintiffs the 40 per cent. due them under the lease, amounting to the sum of $15,776.20, the defendants retaining the remainder. The total production of the claim by the defendants from May 1, 1908, to May 22, 1909, amounted to $132,620.20, and of this amount the plaintiffs were paid the sum of $43,040.08. The several amounts making the latter total sum the plaintiffs received without protest of any kind and without any complaint that the defendants were not working the mine in accordance with the terms of the lease. During all this time—that is to say, during all the time subsequent to the bringing of the action of ejectment on February 24, 1908—the defendants prosecuted the work of sinking shafts, running tunnels up and down and across the deposit, and removing and hoisting gravel from the underground drifts to the surface where it was placed in dumps for washing at the proper season. During this time the evidence tends to show that either personally or by an agent the plaintiffs continued to inspect the work in the mine as it progressed; that from time to time they took samples of gravel from such parts of the mine as they wished without objection or interference on the part of the defendants; that the plaintiffs washed this gravel for the purpose of determining its value and whether the production of the mine as worked by the defendants was satisfactory or not. This procedure was maintained for more than a year, and the plaintiffs continued at each clean-up to receive the exact measure of royalty provided in the lease, and to receipt therefor without demanding more and without claiming that more was due.

During the winter of 1908–09 the defendants at considerable expense mined and hoisted and piled upon the surface two large dumps of gravel, and had washed a portion of it. The plaintiffs had been present, watching the progress of the work without protest or objection, but, notwithstanding this evidence of acquiescence, the plaintiffs on May 20, 1909, interposed by writ of injunction and stopped the work, demanding the defendants to desist from further mining operations upon said claim, and from sluicing and washing the dumps of gravel on said claim, and from separating the gold therefrom. There was evidence tending to show that the estimated value of the gravel remaining in these two dumps at the time the work was stopped by the injunction was $50,000. It is charged by the defendants that the purpose of the injunction was to deprive the defendants of their share of the product of what remained of these two dumps of gravel. We think this evidence tended to establish the defense of estoppel, and that it was proper to go to the jury in support of that defense upon the second cause of action. As said in Dickerson v. Colgrove, 100 U. S. 578, 580, 25 L. Ed. 618:

"The estoppel here relied upon is known as an equitable estoppel or estoppel in pais. The law upon the subject is well settled. The vital principle is

that he who by his language or conduct leads another to do what he would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which he acted.",

To the same effect is Kirk v. Hamilton, 102 U. S. 68, 26 L. Ed. 79.

[3] It is next assigned as error that the court instructed the jury that the lease had been extended for the period of one year from and after the 1st day of September, 1909, and that the defendants had until that time within which to take out any pillars left behind and any bulkheads and pay dirt as low as two cents to the pan left on the limits of the claim already worked, providing the jury should find from the evidence that the defendants had at all times in good faith intended to work out such ground so left and separate the gold from the earth and gravel therein under the terms of the lease. An exception was taken to this instruction on the ground that it did not state that the extension was given prior to the commencement of the action and during the year 1907, and for that reason was misleading and had a tendency to prove an acquiescence after the commencement of the action. There does not appear to have been any controversy as to the time when this extension was made. In the course of the trial and in the presence of the jury it was admitted by counsel for the plaintiffs that the lease was extended for one year in the summer of 1907. With such an admission before the jury and without controversy as to its accuracy, we do not think the instruction of the court was misleading, particularly in view of the positive instruction of the court that, if the jury found by a preponderance of the evidence that the defendants had in any manner substantially violated the terms of their lease before the commencement of the action, their verdict must be for the plaintiffs for the possession of the claim, and that no conduct of the plaintiffs or their agents subsequent to the service of the summons on the defendants in the cause could in any event estop the plaintiffs from maintaining the action and recovering the possession of the premises for such a breach. This instruction, which appears to have been more favorable to the plaintiffs than they were entitled to have given to the jury, precluded any possibility of the jury being misled as to the fact or its tendency to prove an acquiescence on the part of the plaintiffs after the commencement of the action.

The remainder of the instruction is assigned as error, for the reason it is contended that the contract of lease did not authorize the leaving of any pay dirt behind with the intention of removing the same later, but did provide that all of the pay dirt as low as two cents to the pan should be removed as the same was worked from the lower end of the premises. The question for the jury to determine was whether the claim had been worked by the defendants in mine fashion. In the detail of working the claim it was required that the work should start at the lower line, working the same with a straight face at least 100 feet wide or more if required to get all pay dirt as low as two cents per pan. All this was again expressed by the lease. "In other words," that is to say, the defendants were required by the lease "to good and economical mining so as to take out the greatest amount of mineral with due regard to the development and preservation of the same as a workable mine." If, then, the leaving of pay dirt behind

by the defendants to be afterwards removed by them was required under the conditions of working the claim mine-fashion, and of working it economically so as to take out the greatest amount of mineral with due regard to the development and preservation of the same as a workable mine, the defendants had not violated the terms of the lease, but, on the contrary, they had strictly observed its terms. There was evidence introduced tending to show that the leaving of a bulkhead between blocks 1 and 2 for the purpose of keeping out the waters of Ester creek was working the claim mine-fashion, and that the leaving of pillars of unworked gravel to support the overhead earth as the work progressed was working the claim mine-fashion, providing these pillars were removed before the defendants left the claim; and there was evidence of the same character concerning the gravel on the side limits. There was also evidence tending to show that pay dirt was dirt that would pay the defendants to remove. With this evidence before the jury the question as to whether the defendants intended to remove the dirt left behind in the progress of working the mine was merely incidental to the main and controlling question whether they were working the claim mine-fashion and economically so as to take out the greatest amount of mineral with due regard to the development and preservation of the same as a workable mine. If the defendants were prosecuting the work in accordance with the terms of the lease with respect to these requirements, then the intention of the defendants to remove all the pay dirt during the term of the lease was as much in accordance with its terms as any other part of the work.

[4] The court instructed the jury, in substance, that "pay dirt," referred to in the lease, was such a stratum of gold-bearing earth and gravel that the defendants using the approved methods in the vicinity of the mine could remove at a profit over and above the necessary expense of extracting the same; that is to say, "pay dirt" as low as two cents per pan did not mean all dirt in the mine averaging two cents to the pan, but all dirt which it would pay to mine as low as two cents per pan through the employment of minerlike methods. It was objected to this instruction that what was "pay dirt" was a question of fact for the jury, and not a question of law for the court. In this connection the court had instructed the jury that the phrase, "pay dirt as low as two cents per pan," should be considered in connection with the circumstances and conditions surrounding the working of the mine and the physical conditions of the ground, both above and below the surface. After a careful examination of the testimony, we think this instruction was correct as a construction of the terms of the lease in the light of all the surrounding circumstances and conditions pertaining to the working of the claim.

The remaining objections to the instructions of the court have been substantially covered by the discussion of the objections to which specific reference has been made.

Finding no reversible error in the record, the judgment of the lower court is affirmed.