## SOUTHERN PAC. CO. v. WARD.

(Circuit Court of Appeals, Ninth Circuit. October 6, 1913. Rehearing Denied November 17, 1913.)

### No. 2,249.

1. CARRIERS (§ 286*)—INJURIES TO PERSONS AT STATIONS—CARE REQUIRED.

A railroad company is bound to the highest degree of care to maintain order and guard persons waiting at its stations with tickets for its trains against such dangers as may reasonably be anticipated, and what constitutes such care varies with the circumstances and conditions.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1142–1148, 1150–1152; Dec. Dig. § 286.*]

2. CARRIERS (§ 320*)—ACTION FOR INJURY TO PASSENGER AT STATION—QUESTIONS FOR JURY.

Defendant railroad company extensively advertised excursion trains to run for 15 days between a camp where military maneuvers were being conducted and a town, and sold round trip tickets. After 10 o'clock one night, several hundred excursionists, who had spent the evening in the town, were gathered at the station waiting the last return train, which came in late at high speed. It had but three cars, and the people waiting could see that they were already quite well filled. There was a rush, and plaintiff, who was standing some 10 feet from the track and behind others, was pushed toward the train and fell under the wheels and was injured before the train stopped. Defendant had no guards or other employés in attendance to look after and protect the waiting passengers. *Held*, that it was its duty, under the circumstances, to exercise more than the usual care to safeguard the crowd; that it was bound to know that the number of passengers was unusual, to provide sufficient cars for their carriage and see that they were reasonably protected in reaching the same; and that whether it performed that duty was a question for the jury.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1118, 1126, 1149, 1153, 1160, 1167, 1179, 1190, 1217, 1233, 1244, 1248, 1315–1325; Dec. Dig. § 320.*]

3. TRIAL (§ 295*)—ACTION FOR INJURY TO PASSENGER AT STATION—INSTRUCTIONS.

Instructions given, in an action against a railroad company for an injury to a person at a station, considered, and, under the rule that they must be read as a whole, *held* not erroneous.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 703–717; Dec. Dig. § 295.*]

4. CARRIERS (§ 317*)—ACTION FOR INJURY TO PASSENGER AT STATION—EVIDENCE.

On the trial of such an action, it was not error to admit testimony which tended to show the crowded condition of the cars to assist the jury in better understanding the action of the crowd in rushing for the train when it came in.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1295, 1297–1305; Dec. Dig. § 317.*]

DAMAGES (§ 172*)—EVIDENCE—PERSONAL INJURIES.

In an action for a personal injury to an officer of the regular army by which he was incapacitated for service, it was not error to permit him to testify to the number of actions in which he had been engaged, as bearing on the question of mental suffering, nor to compute the amount

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of money he would probably have earned provided he had received no promotion; the pay under the acts of Congress being fixed.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 490–492, 501; Dec. Dig. § 172.*]

In Error to the District Court of the United States for the Southern Division of the Southern District of California; Frank H. Rudkin, Judge.

Action at law by John Wilbur Ward against the Southern Pacific Company. Judgment for plaintiff, and defendant brings error. Affirmed.

J. W. McKinley and R. C. Gortner, both of Los Angeles, Cal., for plaintiff in error.

Edward E. Cothran, of San Francisco, Cal. (M. H. Hyland, of San Francisco, Cal., of counsel), for defendant in error.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge. This is an action for damages growing out of the alleged negligent crushing of the leg of the defendant in error under a passenger train of the Southern Pacific Company. Verdict in favor of defendant in error, and the Southern Pacific Company brings error.

The injury occurred at the railroad station of the Southern Pacific Company at Paso Robles, Cal., on October 8, 1910, at about 11 p. m. Soldiers of the United States regular army and the state militia were engaged in joint maneuvers near Atascadero, a few miles south of Paso Robles; between 5,000 and 10,000 men participating. A considerable number of these soldiers, together with defendant in error, who was at that time a first lieutenant in the regular army, and other officers, had made the trip from Atascadero to Paso Robles on that day over the Southern Pacific Company's road on round trip excursion tickets good for their return within two days. The railroad company advertised the maneuvers at Camp Atascadero by means of posters done in colors, and published special schedules for its trains between Paso Robles and Atascadero for the time from October 1st to October 15th. The schedule showed eight trains daily between the two points· for the period mentioned, and this special schedule had been made generally public among the soldiers. Under this announced service several hundred regulars and militiamen went up to Paso Robles during the day of the 8th on various north-bound trains. At Paso Robles there were, among other amusements, band concerts and swimming contests.

At about 10 o'clock on the evening of October 8th, apparently after the amusements had ceased, a crowd began to gather at the Southern Pacific Company's station in Paso Robles. This crowd is variously estimated by the different witnesses as from 450 to 1,000, composed largely of soldiers and containing in their midst several officers in uniform. Defendant in error, Captain (then Lieutenant) Ward, was one of these officers. The station grounds about the depot were open and

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

unfenced, adjoining public roads and open grounds. A train was due at 10:46 p. m., en route through Paso Robles to Atascadero and beyond, being train No. 10, the New Orleans Limited. Train No. 20 was scheduled to go through in the same direction at 11:16, but it is in evidence that this train did not run. Why No. 20 did not run, or whether the crowd knew it would not run, does not appear.

The crowd was orderly and gave no indication or sign of disorder until the train was pulling in. There was no one representing the Southern Pacific Company who attempted in any way to guide or direct the crowd about boarding the train, and no warning or direction as to the manner in which the crowd should take the train was given. As the train came in, some 10 or 15 minutes late, there was a swaying of the crowd and movement toward the train, by reason of which Captain Ward was jostled and thrown, or fell, so that he went under the moving train; the wheels of one of the cars passing over and crushing his right leg, thereby necessitating its amputation at the knee. Captain Ward was near the tracks, but there were a few persons between him and the train when the movement of the crowd began. One witness testified that he was directly next to Captain Ward when the train came in, that they were six or eight feet away from the tracks, and that when the engine went by there were a few persons ahead of him and both were surrounded on all sides by a crowd of people. Captain Light, an officer of the National Guard of California who was present, said:

"I saw the accident happen to Captain Ward. I was standing about between 10 and 12 feet to the rear of Captain Ward and the officer that he was talking to at the time the accident occurred. From the time that we saw the headlight, the train came on, as I say, at about 25 miles an hour; didn't seem any more than the snap of your finger until the time it was past us, and of course the crowd started to move along, and I saw some one fall ahead of me. By that time I had closed in a little closer to the crowd. And there were some people in between Captain Ward and the train, surging forward themselves to meet the train. * * * The train hadn't stopped, but had kept moving until after Captain Ward was hurt. It hadn't made a stop and then started again; the train was in motion when he got hurt. He did not try to board it. I know, because there was people between him and the train."

There was evidence tending to show that the train approached the station at a rate of speed variously estimated at from 18 to 25 miles an hour and that from this rate of speed members of the crowd gained the impression that it was not going to stop; that the train came in at the usual rate of speed and came to a stop in the usual and customary manner, and at the customary place; that the cars available for passengers, three in number, were well filled, and that before the train stopped it was apparent to the waiting passengers that the accommodations on the train were limited and insufficient for all that desired to return to Atascadero on that train. As the train left Paso Robles, the cars were crowded with people. A witness said:

"There were men sitting on the sides of the seats, standing in between the people that had occupied the train before it arrived at Paso Robles, standing in back of them and in front of them."

There was evidence tending to show that one or more freight cars were standing on the house track between the main track and the depot, that as the train came in the larger portion of the crowd was standing in front of the waiting room of the depot; that when the day coaches passed the crowd moved up in toward the box cars; and that the train stopped with the head of the rear day coach just past the first box car, the rear of the day coach being just past the waiting room of the depot.

Further details will be brought out as the various assignments of error are considered.

In his complaint Captain Ward charges the Southern Pacific Company with liability because of its negligent failure to prepare to accommodate the crowd, its neglect to anticipate a general movement and surging of the crowd to obtain and secure accommodations on the train, its failure to employ means to maintain order in the crowd, and its negligence in approaching the station at an excessive rate of speed and failure to have said train under instant control.

The Southern Pacific Company set up that the accident was not the proximate result of any negligence of the railroad company, and that whatever injuries were suffered by Captain Ward were proximately caused by his own negligence, and that his negligence contributed to cause the accident.

[1] The railroad company contends that the trial court should have directed a verdict in its favor. We are satisfied, however, that in this respect there was no error. Counsel for plaintiff in error are correct in their contention that the duty of the company depends upon the reasonable necessities of the situation and varies according to the circumstances, the kind of crowd, the kind of place, and all other conditions; but we cannot support the argument that under the proofs the issue was purely one of law, for there was ample evidence to require submission to the jury. Taylor v. Penn. Co. (C. C.) 50 Fed. 755; Penn. Co. v. Stockton, 184 Fed. 422, 106 C. C. A. 433. It is well settled that a railroad is bound to take good care to guard against dangers reasonably to be anticipated. This general rule extends to one who is at the depot with a ticket entitling him to ride upon a train. The degree of care required of the carrier is the highest, in maintaining order and guarding those whom it transports against such dangers as might be reasonably anticipated or naturally expected to occur. The record before us shows that the company had advertised an excursion and had transported large numbers of persons from Atascadero to Paso Robles on two-day excursion tickets. While these tickets were good until the next day, it was but reasonable to expect that a great many of the excursionists would return on the same day. So far as the record shows, train No. 10 was the last one that ran from Paso Robles to Atascadero on that day. It was a few minutes late, and there was evidence tending to show that the accommodations for passengers thereon were limited, which was apparent to the waiting crowd before the train stopped. The accommodations were in fact insufficient, although if they had been ample we do not see that it would change the case. The apparent tendency of a crowd under such

circumstances is, when the cars which they desire to board approach, for the people to endeavor to secure places from which they can board the train. There is also an obligation upon a railroad carrier to employ sufficient servants for the protection of its passengers.

[2] It would never do to say that, under the facts of this case, the railroad company could be relieved from responsibility upon the ground that no higher degree of care was called for at its station than was ordinarily exercised when the usual travel was being cared for. The company advertised the excursion extensively and was charged with a knowledge of the number of tickets that it sold to excursionists. It therefore knew in advance that there would be a large number of people traveling to and from Paso Robles. As was said in Harmon v. Flintham, 196 Fed. 638, 116 C. C. A. 312:

"It is obviously a reasonable rule, deducible from the principles of law governing common carriers, that a carrier's proposal through advertisement to conduct an excursion calculated to induce people to travel in unusual numbers implies that it will furnish greater facilities to accommodate and care for those who avail themselves of the proffer than its usual service requires. This applies to the stations and crowds assembling there, as well as to transportation."

No person representing the company made any effort to police the crowd or to manage it when those on the ground in front of the depot made a movement or surging towards the train. In Penn. Co. v. Stockton, 184 Fed. 422, 106 C. C. A. 433, the Circuit Court of Appeals of the Third Circuit discussed the duty of a railroad to a passenger about to board a train at a station. That case, like the one under consideration, presented the question of duty in an action for damages for negligence in causing the death of a passenger on the platform at the height of the summer excursion travel. There the crowd pushed the decedent under the train while he was attempting to get upon it. The court held that the situation was not one which the railroad company had no reason to anticipate. Said the court:

"The crowd was not extraordinary. It was one from which, uncontrolled, an accident might result, and the railroad, although equipped to control it and proving it was its duty to handle the crowd properly, simply left it to take care of itself. Under this situation, a jury might fairly infer that absence of any care was a lack of due care, and negligence is the lack of due care under the circumstances."

Nor can it be held that this case is one of contributory negligence. Captain Ward did not know in advance that the train would be late. He did not know that it would be apparent to the crowd that the accommodations would be inadequate. He did not know, and had no reason to believe, that he was in a position of unusual danger. He had a right to assume that the company would perform its duty and that it would take every necessary and reasonable precaution to protect its passengers rightfully upon the station grounds. The suggestion that, as an officer of the army, he could have commanded the soldiers, is not sound. The men were not there as soldiers under military orders, but went in their private capacities and are to be regarded as persons and passengers rightfully about a depot awaiting an expected train. The speed at which the train came into the depot was a circumstance

proper to be considered. It helped to explain the whole situation. Surely we cannot say as a matter of law that a train advertised to stop at a station, and which came into the depot at a fast rate, would repel a crowd of passengers waiting to board it, rather than draw them closer in a general endeavor to secure position where they could get aboard and obtain seats. It was for the jury to apply its common sense to such a state of facts. It would seem very reasonable to say that if there had been one or two persons in authority representing the railroad, and he or they had told the crowd of the movement of the expected train and of its probable accommodations, the sudden great crowding and resulting danger would not have happened. We must remember that the railroad company induced people to go upon the excursion. Its agents knew whether the sale of tickets indicated that the gathering about the station would probably be larger than usual, and as a consequence it ought to have known whether the danger to passengers would be more than such as would ordinarily surround people awaiting a train. They ought reasonably to have anticipated the probable movement of such a crowd when the train with its crowded coaches rolled into the depot. Mulhause v. Monongahela St. Ry. Co., 201 Pa. 243, 50 Atl. 937. Clearly the jury were the ones to say whether or not the company used proper care in endeavoring to control the crowd and to guard against the dangers arising from the probable conduct of the persons about the station when the train arrived. Barrett v. Southern Pacific Co., 91 Cal. 302, 27 Pac. 666, 25 Am. St. Rep. 186; Riley v. Vallejo Ferry Co. (D. C.) 173 Fed. 331; Harmon v. Flintham, 196 Fed. 638, 116 C. C. A. 309; Richmond & Danville R. Co. v. Powers, 149 U. S. 45, 13 Sup. Ct. 748, 37 L. Ed. 642.

[3] It is argued that the court erred in giving the following instruction to the jury:

"I also instruct you that it is the duty of every public carrier of passengers to employ sufficient servants for the protection of such passengers, and it is under obligations to take due care to secure the safety of a passenger who is upon its premises peaceably for the purpose of boarding its trains."

Counsel for the company contend that the language employed means that it is obligatory upon a railroad to furnish complete security by the employment of servants adequate to secure such security, and hence that the rule as expressed by the court goes beyond the requirement that the highest degree of care shall be employed. But when we examine all of the instructions which were given pertaining to the degree of care which the railroad owed to one about to board its train, surely the jury could not have misunderstood the application of the whole instruction. The court of its own motion charged that the degree of care which one person owes to another depends in a measure upon the relationship which exists between the parties, and that a common carrier—

"owes to its passengers the duty to exercise the highest degree of care for their protection and safety which is consistent with the practical operation of its road; and if you find from the testimony in this case that the plaintiff was on the platform to take a train with a ticket in his pocket, he was within

the meaning of the rule * * * a passenger. That is, the railroad company owed him the same degree of care and protection that it owes to a passenger in actual transit."

The court made its meaning clearer by giving the following instruction:

"Where a railroad company, by reason of an advertisement of reduced rates, induces an unusual crowd to collect at its stations, it is bound to use such means as are reasonably necessary to prevent injury to individuals from the conduct or pressure of the crowd in passing to and from its trains."

Furthermore, at the request of the railroad company, the court charged that while the company was obliged to exercise the highest degree of care and caution to avoid injuries to its passengers, it was not required to guarantee or insure protection from the disorder or violence of mobs or immense and unruly crowds. The court continued:

"The impossible is not required of such companies. If you believe from the evidence that at the time of plaintiff's said accident he was pushed under the said car by an unruly crowd which the defendant was unable to control or restrain, and was thereby and without fault of the defendant injured, then I instruct you that * * * defendant is not liable therefor."

And again, at the company's request, the court told the jury if they believed from the evidence that plaintiff was injured by reason of being pushed under the train by a sudden onrush, if any, of persons towards the train, which the defendant did not know or could not anticipate in advance of the happening of such event, but that such sudden onrush did occur and was the sole cause of the accident, then plaintiff could not recover damages. At defendant's request, the court also stated that, as there was nothing to indicate disorder in the crowd at the station prior to the time the train pulled in, the defendant was under no obligation to police or restrain or attempt to control the crowd *prior* to the arrival of the train; and, continuing, said:

"If, at that time, the injury to plaintiff resulted from a sudden movement or rushing of a portion of said crowd, which the said defendant could not reasonably have anticipated or could not have guarded against by the exercise of any degree of care reasonable under the circumstances, then * * * defendant is not to be held liable in this action."

Under the general doctrine that the instructions must be regarded as a whole, we believe the law was made clear enough, and that absolute security was not made the criterion for guidance. This court, in the case of Belsea v. Tindall, 190 Fed. 440, 111 C. C. A. 244, quoting from Magniac v. Thompson, 7 Pet. 348, 389 (8 L. Ed. 709) used this language:

"In examining the charge for the purpose of ascertaining its correctness in point of law, the whole scope and bearing of it must be taken together. It is wholly inadmissible to take up single and detached passages, and to decide upon them, without attending to the context, or without incorporating such qualifications and explanations as naturally flow from the language of other parts of the charge. In short, we are to construe the whole, as it must have been understood, both by the court and the jury, at the time when it was delivered."

[4] Captain Light, who had witnessed the accident, was asked how he got on the train as it was leaving. Counsel for the company objected to the question as "irrelevant and immaterial." The court ruled that the witness could state what the conditions on the train were. Exception was preserved. The witness answered to the effect that after the train had started he ran some distance before he managed to get on the step after getting hold of the handles of one of the cars, and that he stayed upon the step four or five minutes before he could wedge himself onto the platform; that the men pushed him through; and that it took him 10 or 15 minutes to get inside of the packed car. This testimony may not have been competent from some standpoints, but, as against the general objection made, it was relevant in that it helped to explain to the jury the extent of the crowd that had theretofore surged toward the cars and bore out the accuracy of the judgment of the people to the effect that accommodations were very limited, and thus the jury were better able to draw conclusions as to the conduct of the crowd when the train came in.

[5] In the course of the trial evidence was admitted to show the provisions of the acts of Congress concerning retirement and promotion of officers of the army, and Captain Ward was allowed to testify as to the number of actual engagements of war in which he had participated; he was also allowed to compute the amount of money which he would have earned as a captain by the rule of promotion in the army. The company says this was error. The salary and emoluments of an officer of the army are, however, fixed and certain under the acts of Congress. The age of retirement, 64, is prescribed by statute, and, while the court might as a matter of law have stated to the jury what these statutes were, it was not prejudicial error to permit Captain Ward to answer the questions covering the point. Neither was it error to permit Captain Ward to say how many battles or military engagements he had participated in. He was entitled to recover for mental anguish as well as pain, and, as bearing upon the question of suffering of mind, it would seem wholly just to consider those incidents directly connected with his chosen profession and which served to disclose his general proficiency and achievement in it and attachment to it. Captain Ward based his computation as to the probable amount of money which he would have earned upon his actual rank of captain. We think this in no way prejudicial to the railroad company, for it eliminated every element of probable promotion to any rank higher than captain. Upon this hypothesis the earning capacity of a captain of the army at the age of 35 may be arrived at by computation of the salary paid to him at the time of his testimony and up to the age of retirement and adding to it such sums as he may lawfully be entitled to in addition to such salary, such as longevity pay and commutation for quarters.

The court, among other things, charged that, if it were shown that two parties had contributed to the injury of a third person, then, notwithstanding the act of one of said two parties might have been reckless and that of the other merely manifesting the want of ordinary care, neither of said parties is relieved of liability for the injury to

such third person who has not himself been guilty of contributory·negligence. The objection urged to this instruction is that it was not limited to negligence directly or proximately producing the accident or contributing thereto. But an examination of the instructions as a whole discloses that the jury was given to understand that there could be no recovery except where the injury had resulted from negligence which was the proximate cause of the accident. This general rule was repeated several times, so that they must have understood that any breach of duty to authorize recovery must have been the direct and proximate cause of the injury. The instruction was not inappropriate for the reason that there was testimony introduced by the railroad company tending to show that a teamster recklessly grasped the handles of the in-coming train and that in this way Captain Ward was thrown down and injured. It therefore became fitting that in considering the facts of the case the responsibility of the railroad company should be viewed from any situation brought about by such recklessness.

These views cover the principal points of the case. We have also carefully examined the several other assignments of error upon which plaintiff in error bases its arguments, but do not find that any of them demonstrates prejudicial error.

The judgment is therefore affirmed.